JOHN S. WILLIAMS, ADMINISTRATOR OF JAMES WILLIAMS, DECEASED, APPELLANT, *v.* ROBERT M. GIBBES AND CHARLES OLIVER, EXECUTORS OF ROBERT OLIVER, DECEASED.

In 1816, an association called the Baltimore Company, was organized in Baltimore, for the purpose of furnishing advances and supplies in fitting out a military expedition under General Mina, against Mexico, then a part of the dominions of the King of Spain. See 11 How. 529, and 12 Ib. 111.

One of the shareholders having become insolvent, in 1819, his trustee sold the share in 1825. The original transaction being illegal, the share could not be considered, by the laws of Maryland, as property passing by the insolvency to the trustee. Consequently, the sale by the trustee passed nothing to the assignee. The court of appeals of Maryland so decided, and this court adopts their construction of their own laws.

An act of the Legislature of Maryland, passed in 1841, made the sale of 1825 valid, so far only as defects existed for the want of a bond, by the trustee in insolvency, and the want of a ratification of the sale by the court. But it did not purport to cure other defects in the title of the trustee. Nor did the court of appeals decide that it went any further than to cure the two defects above mentioned.

In 1846, the Baltimore county court distributed the fund, and awarded the proceeds of the share in question to the executors of the assignee. This decree was affirmed by the court of appeals in 1849. But during this time there was no person authorized to protect the interest of the insolvent. He had died in 1836, and no letters of administration upon his estate were taken out until 1852.

In the distribution of a common fund amongst the several parties interested, an absent party, who had no notice of the proceedings, and who was not guilty of wilful laches or unreasonable neglect, will not be concluded by the decree of distribution from the assertion of his right by bill or petition against the trustee, executor, or administrator; or, in case they have distributed the fund in pursuance of an order of the court, against the distributees.

The English and American cases upon this point examined.

The present claim being made by the administrator of the insolvent, against the executors of the assignee, it is not necessary, under the circumstances of the case, to turn the plaintiff over, for his remedy, against the distributees.

THIS was an appeal from the circuit court of the United States for the district of Maryland.

It was, in some respects, similar to the preceding case of Mc-Blair, administrator of Goodwin v. Oliver's executors; but it differed from it in the important point that the original holder of the share, namely, Williams, never made any assignment of it to Oliver. The title of the latter was derived exclusively from a purchase made by him from George Winchester, the trustee of Williams in insolvency.

The Mexican Company consisted originally of ten persons, each holding one share. One of the parties declining to pay up, the remaining nine advanced the necessary amount, and thus the company was reduced to nine persons or firms, namely, D'Arcy and Didier, Hollins and McBlair, Descoves and Mercier, Dennis A. Smith, Jeremiah Sullivan and John Sullivan, John Gooding, James Williams, Thomas Sheppard, and Lyde Goodwin.

In 1819, James Williams applied for the benefit of the insolvent laws of Maryland, and George Winchester was appointed his trustee, from whom Mr. Oliver purchased the share, in 1825, for $2,000. Winchester had omitted to give bond or to have the sale ratified by the court, and an act was afterwards passed by the legislature of Maryland, to cure these defects.

Williams died in 1836, and no letters of administration were taken out until 1852, when the present appellant became his administrator, and filed the bill in the present case. The ground assumed was the same with that taken by McBlair, in the preceding case, namely, that if the assignment to Oliver made by the trustee in insolvency was void, the interest of Williams must remain in his personal representatives.

On the 4th of October, 1841, a bill was filed on the equity side of the county court of the sixth judicial district of Maryland state court, by Philip E. Thomas and John White, trustees of Dennis A. Smith, against the following persons interested in the share of Dennis A. Smith, namely: Dennis A. Smith, James W. McCulloh, administrators; Job Smith, the President and Directors of the Mechanics' Bank of Baltimore, John Glenn, David M. Perine, William Gwyn, and James W. McCulloh, trustees; Mrs. Smith, William Brown, James Brown, John Patterson, Walter Smith, executor; Clement Smith, George Brown, Herman Perry, Virgil Maxcy, Samuel Nevins, —— Nevins, Joshua Lippencott, John S. Smith, Richard Harding, and A. H. Lawrence, and the President, Directors, and Company of the Bank of the United States. The bill set forth the deed, the amount awarded to D. A. Smith, and the whole amount awarded to Glenn and Perine, the existence of charges and claims affecting in common their share of the fund and the residue in the hands of Glenn and Perine; and after suggesting, in general terms,

Williams *v.* Gibbes et al.

that they were advised there were other interests represented by Glenn and Perine, connected with the claims of Dennis A. Smith, of the particulars whereof they were not informed, but which Glenn and Perine could state, and which were proper subjects for distribution by the court, they pray for a proper distribution of the certificate, &c., growing out of the awards aforesaid, for allowance of commissions for notice to the persons interested as aforesaid to present their claims before the auditor, and for general relief.

Glenn and Perine filed their answers, admitting the facts set forth in the bill; expressing their willingness to have the proceeds of the awards therein mentioned distributed under the direction of the court to the persons entitled thereto, including the award in favor of those respondents under the agreement in the bill; and joined in the prayer for a reference to the auditor.

A notice was ordered by the court, and published on the 28th of October, 1841, requiring all persons interested in the claims of D. A. Smith and the Mexican Company, on Mexico, to present their vouchers, properly authenticated, on or before the 1st January, 1842.

The cause was continued, from time to time, until the 23d of January, 1842, when Nathaniel Williams intervened, as the permanent trustee of James Williams, appointed in the place of George Winchester. He claimed the proceeds of the share of James Williams, upon the ground that the assignment to Oliver, by Winchester, was irregular and void.

It is not necessary to state the numerous claimants who presented themselves, or the grounds upon which they rested their claims.

Another order was published on the 5th of September, 1843, giving notice to all persons having claims on the funds awarded to the Mexican Company of Baltimore and Dennis A. Smith, to file their claims, with the vouchers and proofs, on or before the 5th October, 1843, else they might be barred from the benefit of the distribution of the fund.

On the 5th of December, 1846, the court pronounced its decree, awarding, amongst other things, that the proceeds of the share of James Williams should be paid to the executors of Oliver, claiming under the assignment from Winchester, the defects of which were cured by an act of the legislature.

Upon an appeal from this decree to the court of appeals of Maryland, the decree of the county court, in the above respect, was affirmed.

In August, 1852, John S. Williams, as administrator of James Williams, deceased, filed his bill against the executors of Oliver, in the supreme court of Baltimore city. The executors removed

the cause into the circuit court of the United States, upon the allegation that they were citizens of the State of New York. The part of the bill which brought up the question in the cause was the following: —

Your orator further states to your Honor, that the said James Williams departed this life on or about 20th day of September, in the year 1836, in Harford county; that no letters of administration were ever taken out upon his estate, until they were in due form of law granted to your orator by the orphans' court for Harford county, on the 15th day of March, in the year 1852. That he has given bond, approved by said court, for the faithful performance of the trust reposed in him.

That neither said Williams nor your orator were ever present, or parties to, or in any manner bound by any proceeding, or order, or decree, had or passed in the aforesaid suit of Thomas White *v.* Dennis Smith and others, in Baltimore county court, as a court of equity, or in any appeal from the doings of said court, to the court of appeals for the western shore of Maryland, and that any thing done or enacted in either of said courts was transacted in the absence of the said Williams and your orator; that the settlement and adjustment of the amount of the partnership funds of the said Mexican Company, and of the charges, and commissions, and costs, to which they were liable *in solido*, and the distribution of the remainder of said funds by the decree of the court, into the several shares to which each member of said company was entitled, are in no manner binding upon, or even evidence against the said Williams or your orator, &c., &c.

The respondents answered the bill, setting forth various grounds of defence, and particularly relying upon the decree of the court of appeals, affirming the judgment of the county court. The opinions of the judges of the court of appeals have been published, *in extenso*, in one of the preceding volumes of Howard's Reports, and therefore need not be repeated here.

On the 3d of December, 1853, the circuit court dismissed the complainant's bill, with costs, and the complainant appealed to this court.

It was argued by *Mr. Davis*, and *Mr. Dulany*, with whom was *Mr. Martin*, for the appellant, and by *Mr. Campbell*, and *Mr. Johnson*, for the appellees.

Only such of the arguments of counsel can be reported as related to the point upon which the decision of the court turned.

The counsel for the appellant contended: —

II. The decree of the court of appeals is not a bar.

1. It is no estoppel, as *res adjudicata.* For Gooding and

Williams were not parties named in the bill, nor petitioners under the decree; and no notice, actual or constructive, of the pendency of the suit is shown or averred.     Hollingsworth *v.* Barbour, 4 Pet. 475 ; Aspden *v.* Nixon, 4 How. 467, 497, 498.

2. Both Williams and Gooding were dead before the suit was instituted; and no administration existed till after final decree.

The decree, therefore, cannot bind them as either parties or privies.

3. The title decided on was different.     The title of Gooding and Williams was never in issue.     The only issue on the record was, the validity of an assignment of a prior insolvent trustee, questioned by a subsequent insolvent trustee.

No matter what the court might have thought or said, on such an issue the decree could not conclude a title paramount to both the litigants.     For our title originated in the award subsequent to the insolvent assignment.

III. The decree does not bar the complainants as a final disposition of a fund in court for distribution, by reason of their failure to intervene.     For,

1. The suit did not profess to be on behalf of all the claimants of the Mexican Company's fund.

It contains no description of the fund, of the parties entitled, or of the Mexican Company; and no prayer for the administration of the fund.

Its allegations and averments look to the administration of the share and private fund of D. A. Smith, under the deed to Thomas and White, among the creditors of D. A. Smith, who are parties; and to have included in that suit the allegations requisite to enable the court to administer the whole fund of the Mexican Company among the members, would have made the bill multifarious and demurrable.     Only a few loose phrases allude to any thing outside the trusts of the deed to Thomas and White.

Thus Williams and Gooding were neither bound nor entitled to come in under the decree.     The Mary, 9 Cranch, 126 ; Good *v.* Blewitt, 13 Ves. 397 ; Ib. 19 Ves. 336 ; Hays *v.* Miles, 9 G. and J. 193, 197, 198 ; Chalmers *v.* Chambers, 6 H. and J. 29, 30.

2. Had the bill been expressed to be by a few on behalf of all the claimants of the fund, yet

(*a*). It is not a case where a few could sue for all; for the members of the company were only nine, were all known, and could and should have been made parties by name or by their representatives.

(*b*) But even if it were a case where a few may sue for all, and the bill properly framed, yet the decree in a suit by a few

for distribution of a fund among all interested is not ever, in itself, a bar to one who did not come in.

(*c*) Its only effect is to protect the trustee, and shift the remedy from him or the fund against the party to whom it was awarded.    Gillespie *v.* Alexander, 3 Russ. 130 ; David *v.* Frowd, 1 Myl. and Keene, 200 ; Greig *v.* Somerville, 1 Russ. and Myl. 338.

(*d*) It has never been held conclusive upon the right of a party, unless the failure to intervene has been wilful, after actual notice, and without adequate reason ; and even then the delay after the decree and distribution was the main ground of exclusion ; and the only case going so far was reversed on appeal.    2 Danl. C. P. 1453 ; Sawyer *v.* Birchmore, 1 Keen, 391, 825.

But in these cases,

(*a*) Both parties were dead before the suit was brought, and so could be in no default.

(*b*) No administration existed on the estate of either, till after final decree.

(*c*) No notice is shown to have been brought home to any one creditor or distributee, interested in either estate.

IV.    The decision of the court of appeals is not such an authority of a local tribunal, on a local law, as compels the supreme court, irrespective of its own opinion, to hold Oliver's title better than that of the complainants.    For

1. The opinion does not declare the title of Oliver to be good, but really pronounces it invalid.

It decides the claim to be so corrupt as to be utterly void, and that, therefore, it will not pass to an insolvent trustee.  Rec. Williams *v.* Oliver, 307, 308.

This is decisive, that Winchester never had any interest in the fund at all ; and, consequently, could assign none.

The court then say, in consideration of the peculiar nature of the contest between two trustees of the same party, hypothetically, if we are wrong in supposing the claim never vested, in that event, if it could vest, it was assignable ; and, being so, it passed to Oliver by the first trustee's assignment.

But they expressly declare it did not vest in him at all ; and merely add this subsidiary and hypothetical ground to show that the complainant, on his own hypothesis, had not the best title before the court.  Rec. Williams *v.* Oliver, 82–84.    The supreme court have so construed this opinion.    Williams *v.* Oliver, 12 How. 111.

If it be argued,

2. That the court, in the face of this opinion, awarded the fund to Oliver, we reply : —

(*a.*) The question now relating merely to matter of authòrity, such a decisîon, if it really were tenable on no other hypothesis than an affirmance of the validity of Winchester's assignment, would so contradict the opinion, as to destroy all weight of either as authority. It makes the court say one thing, and do its diametrical opposite.

(*b.*) But the question is not what might have been, but in fact was not held, but what, in point of fact, was the opinion of the court about Oliver's title ; nothing shows that they did hold Oliver's title good. For,

They may have decreed Glenn and Perine to convey to Oliver, in the absence of a better title, on their confession of a trust for them, and the language of the award, which, in the absence of any one else appearing to be concerned, declared them trustees for Oliver's executors.

It would seem demonstrable that, whatever may be thought of its correctness, this was the only ground on which the court did, in fact, rest their decree.

For, if the court considered the question of title at all, they must be presumed to have confined themselves to those titles which alone appear on the pleadings.

Those titles are : —

1. The award and deed of trust and confession of Glenn and Perine, that they hold in trust for Oliver's executors, not for Oliver.

2. The title of Oliver, under the assignment of Winchester, first insolvent trustee.

3. The title of Williams, second insolvent trustee.

The court, therefore, in making the decree, must have held, either

1. That the question lay between two insolvent trustees of the same man ; and the fund being in the hands of trustees, confessing a trust for that trustee who had the better right of the two, the court would not take it from a better, and give it to a worse title.

This court has countenanced this view, and it is consistent with the opinion of the court of appeals.

2. That a title vested in Winchester, which passed to Oliver by his assignment.

But this could be only on one of two grounds : —

(*a.*) That the Mexican claim was assignable in 1819, and passed to Winchester, on the insolvency of Gooding and Williams.

But this they have expressly declared not to be the law. Or,

They held that the treaty related back, and made valid what

21 *

before was invalid; and the treaty and act of 1841 together gave a good title.

But this is directly in contradiction with the very words of their opinion. For,

They turned Gill out of court, though he was assignee in 1817, prior to Oliver's assignment, on the express ground of the original turpitude of the transaction, which would have been absurd, if that original sin had been cured by relation. Therefore,

1. They did not pass on the absolute title of any one; but only awarded the fund to the party for whom the possessors confessed a trust, and the award itself showed a *primâ facie* claim.

In neither aspect of the case has the act of 1841, ch. 309, any thing to do with this point.

(*c.*) Such an opinion is not such a declaration of settled local law, as will relieve or preclude this court from giving its own opinion fair play.

It was only a decree by three, out of a court of six; and they differed on the grounds of the decision. Rec. Williams *v.* Oliver, 306–308; Craig *v.* Missouri, 4 Pet. 427; Carroll *v.* Carroll, 16 How. 275.

It has never been held, that the mere fact of a decision in a state court, on the same papers, binds the United States courts.

It is mere matter of authority; and that only when it relates to some state statute or usage, or real estate title, or peculiar local law. And, in all such cases, the authority depends entirely on the question actually passed on by the court, not what might have been, but in fact was not decided.

That is the exact difference between a decree operating to bind an interest, whether by technical estoppel or negligence to appear on notice, and the operation of the opinion of the same court, in the same case, as an authority declaring the law of the State. It may be that the pleadings and decree may establish, between the parties, a result in which the court never contemplated affirming, nor considered as the law in general; for example, here the decree is binding on the trustee, whether the court be right or wrong in giving the fund to Oliver; but, for this suit, the very question is not what they did, but why — on what principle, they did it?

(*a.*) If, in fact, the court did affirm the validity of the assignment of Winchester, it is demonstrated that the decision was not on the local insolvent law, but one directly on the laws of the United States, and so peculiarly within the cognizance of this court.

For a decision affirming the validity of any assignment

impeaches that operation of the United States laws, which annuls every contract in violation of them. Armstrong *v.* Toler, 11 Wheat. 258; Craig *v.* Missouri, 4 Pet. 410; Green *v.* Neal, 6 Ib. 297; Swift *v.* Tyson, 16 Ib. 1; Foxcroft *v.* Mollet, 4 How. 379; Nevins *v.* Scott, 13 Ib. 268; Trumbo *v.* Blizzard, 6 G. and J. 23.

V. There can arise no question of the effect of Winchester's assignment as a contract, which, though not capable of being enforced, may yet protect Oliver by estoppel. For

Williams's title is not as insolvent trustee, but as administrator, and since the contract of Winchester, and for property never vesting in him.

No question of estoppel can exist. Fairtitle *v.* Gilbert, 2 Term R. 171; Pen. Del. Md. Co. *v.* Dandridge, 8 G. and J. 248; 1 Atk. 354.

Neither does the original turpitude of the claim bar us; for

We do not rest on the Mexican contract. Our title, and our only title, is the award.

Our relation to the Mexican Company is referred to merely as matter of description. The award gave the funds to the members of that company, or those legally representing them. To insist on the original turpitude is to annul the award, and to impeach the right which it created.

VI. The death of Gooding, in 1838, and Williams, in 1839, just before the treaty, does not oust their title.

No treaty meant to confine a benefit thirty years old to the very persons originally claiming. Nearly all the company were dead. The personal representative stands in the place of the deceased; and the award is of a fund, in augmentation of the estate.

There is no question of relation; the administrator takes as of the date of the treaty or award. It is like a partnership claim, awarded to one partner after the death of another, without administration. It enures to deceased's estate.

On this principle the court proceeded, when they resolved the abandonment of Stevenson's share, and confined the division to the other nine. Campbell *v.* Mullett, 2 Swanst. 551; Stevens *v.* Bagwell, 15 Ves. 140; Murray *v.* East Jersey Co. 5 B. and Ald. 204.

VII. That the bar of limitation does not apply, in the absence of a personal representative. Fishwick *v.* Sewell, 4 H. and J. 393; Angell's Lim. 173, 184, 185; Haslett *v.* Glenn, 7 H. and J. 17; Ruff *v.* Bull, Id. 16; 2 Salk. 421; Murray *v.* East Jersey Co. 5 B. and Ald. 204.

The view which the counsel for the appellees took of the point in question was the following:—

1. The decree of the Maryland court of appeals, in the distribution suit originating in Baltimore county court, adjudging Williams's share in the Mexican Company to Oliver's executors, is conclusive, as to their title, upon all persons, in all jurisdictions.

The bill in the distribution suit (Record in Goodwin's case, 18) prays: " That the funds growing out of the award may be properly distributed, under the direction and authority of the court, among the persons entitled thereto, whether as *cestuis que trust*, under the indenture aforesaid, subscribing the same, or as otherwise interested, in the view of a court of equity, in the proceeds of said award."

The answer of Glenn and Perine (Record in Goodwin's case, 28) says: That " they are willing and desirous that the proceeds of the awards therein mentioned may be distributed among the parties entitled thereto."

Of the character of this proceeding this court has already expressed its opinion, in 12 How. 122, where it declined to take jurisdiction of it. It characterizes it as a suit for distribution dependent on the laws of Maryland, which involved and decided the right and title to the shares claimed in it under those laws.

It was not, then, a proceeding simply meant to distribute the fund in court among the parties bringing it in, or those they represented; but a suit to ascertain who were really entitled to the money in court, and to give it to those whom the court, the custodiary of the fund, should find so entitled. It was, in other words, a proceeding *in rem*, and the final action of the court upon the *res* must be, and was meant to be, conclusive on all the world, as to notice, parties, title, and every thing else that was adjudicated by it; the court in which the proceeding took place having undoubted jurisdiction over the subject-matter of it. Tongue *v.* Morton, 6 H. and J. 23; 2 Maryland R. 451; 2 How. 338; 3 Wheat. 246; 9 How. 348.

The title of Oliver's executors to Williams's share, which is now denied, is the same title which the court of appeals affirmed; and it is impossible for this court to deny that title, without, at the same time, affirming that the court of appeals of Maryland ought not, on the facts before it, to have decreed in favor of the executors. It is respectfully submitted, that no other court can thus impeach the decree of the court of appeals of Maryland, which, with full jurisdiction in the premises, determined Oliver's executors to be the owners of Williams's share absolutely, and not as between them and any one else.

The distribution of the fund was a proceeding *in rem*, and the presence of parties was not necessary. We could not

compel administration to be taken out. Must the whole fund wait till they chose to administer? The other side must show that they were not guilty of laches. They only know the reasons why they were not, and the bill sets forth no sufficient excuse. Although these parties may not have been before the court, yet their title was; because the executors of Oliver set forth the assignment to them by the trustee.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the circuit court of the United States for the district of Maryland.

The bill was filed in the court below to recover of the defendants the proceeds of the share of James Williams, in what is called the Baltimore Company, which had a claim against the Mexican government, that was allowed under the convention of 1839. The claim was similar to the one under consideration in the case of the administrator of Lyde Goodwin against these defendants, just disposed of. The proceeds of the share, as charged, amount to $41,306.41.

The main grounds of defence set up in this case are : —

1. The sale of this share in the company to Robert Oliver, for a valuable consideration, by George Winchester, permanent trustee of Williams, who had taken the benefit of the insolvent act of Maryland, in 1819, which was made in pursuance of an order of the court having jurisdiction in cases of insolvency under that act. The sale took place on the 2d April, 1825.

2. A decree of the court of appeals in Maryland, at the June term, 1849, affirming a decree of the Baltimore county court, which, in the distribution of the fund arising from this claim of the Baltimore Company, assigned the proceeds of the share in question to the executors of Oliver.

If the appellees fail to maintain their title to this fund, upon one or the other of these grounds, then the right to the share of Williams in the Baltimore Company, for aught that appears, still belonged to him at the time of his decease, in 1836, and passed to his legal representatives as a part of his estate; and although originally of no legal value, on account of the illegality of the transaction out of which the contract arose, yet, as the illegality has been waived and the money realized, we have seen, from the principles stated in the previous case of Lyde Goodwin, it belongs to Williams's administrator.

As it respects the first ground—the sale of the share of Williams, by the provisional trustee, to Robert Oliver, under the insolvent act — we have seen, in the case of Lyde Goodwin, the court of appeals of Maryland held, that this contract of the Baltimore Company with General Mina, being in violation of

the neutrality act of the United States, of 1794, was so tainted with turpitude and illegality, it could not be recognized under their insolvent laws as property; and that no right to or interest in the share passed to the trustee. And, that this being the construction of the statute by the highest court of the state, and which had a right to interpret its own laws, this court felt bound by it, without inquiring whether that interpretation was correct or not; and, consequently, as Goodwin's interest in the share did not pass to the insolvent trustee, it remained in Goodwin himself, and passed to the executors of Oliver, by virtue of his assignment to their testator, in 1829.

In this case the executors of Oliver are obliged to make title to the share in question, under the insolvent trustee of Williams; the assignment to Oliver, their testator, having been made by the trustee, and not by Williams himself. And it is now insisted on behalf of the executors, that the court of appeals of Maryland in this case reversed their opinion delivered in the case of Goodwin, and held that the interest in the share did pass under the insolvent laws to the trustee, and consequently that the proceeds of the share vested in them under his sale and assignment to their testator in 1825.

Had this been the decision of the court of appeals in the case of the share of Lyde Goodwin, the interest and proceeds would have passed to Gill, the permanent trustee, instead of to the executors of Oliver.

These results, so contradictory and inconsistent, claimed too as flowing from the judgments of the highest court in a State, should not be admitted unless compelled, after the most careful and deliberate consideration.

The decision in both cases was made at the same term, June, 1849; the one in the present case subsequent to that in the case of Goodwin. The court in their opinion state, that the grounds upon which they affirmed the judgment in this case were, first, for the reasons assigned by them for their decree in the previous case of Oliver's executors against Gill, permanent trustee of Goodwin.

The grounds for that decree are stated in the record, and as far as material are as follows: " They are of opinion that the entire contract (the Mina contract) upon which the claim of the appellee (Gill, the trustee,) is founded, is so fraught with illegality and turpitude as to be utterly null and void; conferring no rights or obligations upon any of the contracting parties, which can be sustained or countenanced by any court of law or equity in this State; that it has no moral obligation to support it, and that, therefore, under the insolvent laws of Maryland, such claim does not pass to or vest in the trustee of an insolvent

petitioner.    It forms no part of his property or estate, within the meaning of the legislative enactments constituting our insolvent laws."

Nothing can be more explicit or decisive against the title of the insolvent trustee, or of those setting up a claim under him, to a share in this Baltimore Company.  The court say : " It has no legal or moral obligation to support it, and that, therefore, under the insolvent laws of Maryland, such a claim does not pass to or vest in the trustee of an insolvent petitioner.    It forms no part of his property or estate, within the meaning of the legislative enactments constituting our insolvent system."   And this opinion is reaffirmed, *ipsisimis verbis*, in giving the judgment against the trustee of Williams, then before the court, and with which we are now dealing; and yet it is gravely insisted that no such decision was made in this case as was made in the case of Goodwin; but, on the contrary, the court decided that the interest in the share of Williams did pass under the insolvent laws to the trustee; that he became thereby invested with the title, and was competent to transfer it to Robert Oliver, the testator of the defendants.

The supposed contradiction and inconsistency of the determination of the court is founded upon the second paragraph in the opinion delivered.    It is as follows : 2.  " Because, under the proceedings based on or originating from the insolvent petitions of John Gooding and James Williams, and the act of assembly applicable thereto, Robert Oliver acquired a valid title to all the interest of said James Williams and John Gooding in the fund in controversy, for the reasons assigned by Judge Martin as the basis of his opinion in those cases."

Judge Martin had dissented from the opinion of the majority of the court, in the case of Lyde Goodwin, being of opinion that the interest in his share passed under the insolvent laws to the trustee; and had maintained the same opinion in respect to the share of Williams, in the case then before the court.    And it is supposed that this opinion was adopted by the other members, in the determination of the case.

We do not agree that this is a proper apprehension of the judgment given by the two members of the court; but, on the contrary, are satisfied that the opinion delivered may well warrant a more natural and consistent interpretation.

The true meaning will be apparent, we think, from the following explanation.   Robert Oliver, as we have seen, had purchased the share of Williams of the insolvent trustee, in 1825, and, consequently, if the interest in his share passed under the insolvent laws to the trustee, it had become vested in Oliver, and of course, on his death, in the executors.

The question before the court was between the insolvent trustee and the executors. The court, after reaffirming their opinion in the case of Lyde Goodwin, namely, that no interest in the share passed to the trustee under the insolvent laws, and therefore that he was disabled from making out a title to it, go on in substance to say, that if in error as to this, and the opinion of Judge Martin should be adopted, namely, that the interest did pass to the trustee, it could make no difference in the result, inasmuch as the executors of Oliver would then be entitled to the proceeds, under his purchase of the share from the trustee himself, in 1825. Therefore, viewing the case in either aspect, *quacunque via data*, the insolvent trustee had failed in establishing any interest in the fund.

It appears to us that this is obviously the meaning intended to be expressed, though we admit the terms used in the expression of it furnish some plausibility for the criticisms to which it has been subjected. The two opinions, the one in the case of Goodwin, and the other in the case of Williams, were given at the same term, and upon the same question; and, if the interpretation of the defendants is right, are diametrically opposite to each other; and not only so, as the first opinion is incorporated in the second, the judgment rendered in the case of Williams is founded upon two opposite constructions of the same statute, in one and the same opinion.

We prefer the explanation we have given to this extraordinary and absurd conclusion, as it respects the proceedings of a respectable court, and one possessing the highest jurisdiction in the State.

The change of opinion upon a question of law, or in the construction of a statute, is no disparagement to a judge, or a court, however eminent or experienced. The change is oftentimes a matter of commendation, rather than of reproach. But the case here presented, and upon which we are asked to turn the decision of the question, is, that two opposite constructions of a statute have been given by the court in the same cause, leading necessarily to opposite results, and both relied on as grounds for the judgment rendered. We have already assigned our reasons for disbelief in any such conclusion, and shall not again refer to them.

It has been suggested that the statute of Maryland, of 1841, confirming certain defective proceedings in insolvent cases, operated to confirm the sale of the trustee to Oliver, in 1825, and that the opinion of the court of appeals in the case of Williams is founded upon this statute. Winchester, the permanent trustee at the time of the sale, had not given a bond, with surety, for the faithful execution of his duty, as required by the law; and,

under the decisions of the courts of Maryland, this omission disabled him from dealing with the estate of the insolvent.

The act of 1841 was passed to remedy defects of this description. It provided that all sales and transfers of property and claims, theretofore made by any permanent trustee, &c., under the insolvent laws of the State, shall be valid and effectual, notwithstanding such trustee shall not have given a bond with security, &c.; and the 3d section provides that the act shall not be so construed as to cure any other defect in the proceedings than the failure to give a bond, with security, or the want of any ratification by the court of any sale made by such trustee.

It is quite apparent from the provisions of the act, that it was not designed to confirm all sales previously made by the trustee under the insolvent laws, and render them valid and effectual, but simply to confirm, so far as respected any defect arising out of the omission of the trustee to give the proper security, and also as respected any omission on the part of the court to confirm the sale. These two defects in any previous proceedings were cured by the statute, but in all other respects the proceedings were valid, or otherwise independently of it. It is impossible to maintain that the statute looked to any such informality in the title of the trustee, as that held by the court of appeals in the case of Lyde Goodwin, as well as in the present one. And, besides, it is inconceivable why the court should have reaffirmed their opinion in the case of Goodwin, as a ground for denying the title to the trustee, if they had intended to hold that it passed by force of the act of 1841. We have no belief that such was the opinion intended to be expressed.

The decree of the court affirming the judgment of the court below has been referred to as favoring the view of the decision contended for by the appellees. This decree adjudges and decrees, that the judgment below awarding the share of Williams to the executors of Oliver be affirmed, and that Glenn and Perine, the general trustees of the fund, pay the proceeds of the share to the said executors.

It will be remembered that the only question before the court respecting this share was between the executors on the one side, and the insolvent trustee of Williams on the other; and as the executors were the apparent owners of the fund, unless a title could be maintained by the trustee, so far as respected the pa ties before the court, the former exhibited the better title; at least, the better title to take the possession and charge of the fund in the distribution among the claimants. The form of the decree, therefore, was very much a matter of course, in the aspect of the case as then presented.

This view will be more fully appreciated when we refer to

another branch of this case, presently to be considered. We will simply add, in our conclusion upon this part of the case, that the opinion now expressed was the one entertained by us when the case involving this share of Williams was formerly before the court, and which will be found in 12 How. 111, 123.

On page 123 we observed " the counsel for the plaintiff in error sought to distinguish this case from the previous one, the case of Lyde Goodwin, and to maintain the jurisdiction of the court, upon the ground that the act of the legislature of Maryland of 1841, confirming the authority of Winchester, the permanent trustee, was in contravention of a provision of the constitution of the United States, as " a law impairing the obligation of contracts."

But we observed in answer, " admitting this to be so, which we do not, still, the admission would not affect the result; for the decision of the court of appeals upon a previous branch of the case denied to the plaintiff any right to or interest in the fund in question, as claimed under the insolvent proceedings as permanent trustee, and hence he was deemed disabled from maintaining any action founded upon that claim.

" It was of no importance, therefore, as it respected the plaintiff, in the distribution of the fund, whether it was rightfully or wrongfully awarded to Oliver's executors. He had no longer any interest in the question."

Our conclusion, therefore, upon this part of the case is, that according to the law of Maryland, as expounded by the highest court of the State, no title to or interest in the share of Williams in the contract of the Baltimore Company, under General Mina, passed under the insolvent laws of that State to the insolvent trustee; and, consequently, no interest in the same became vested in the executors of Robert Oliver, by force of the assignment from the trustee to him in 1825.

2. The next question is as to the conclusiveness of the decree of the Baltimore county court, making a distribution of the fund among the several claimants, and which was affirmed by the court of appeals, upon the rights of the administrator of Williams to the proceeds of his share in the fund. The decree in the Baltimore county court was rendered in December, 1846, and affirmed June term, 1849.

Williams died in 1836, and no letters of administration were taken out upon the estate till 1852. It appears, therefore, that Williams had been dead ten years when the first decree was made, and thirteen at the date of the second; and no representative was in existence to whom notice of the proceedings could affect in any way the interest of the estate in the fund.

Now, the principle is well settled, in respect to these proceed

ings in chancery for the distribution of a common fund among the several parties interested, either on the application of the trustee of the fund, the executor or administrator, legatee, or next of kin, or on the application of any party in interest, that an absent party, who had no notice of the proceedings, and not guilty of wilful laches or unreasonable neglect, will not be concluded by the decree of distribution from the assertion of his right by bill or petition against the trustee, executor, or administrator; or, in case they have distributed the fund in pursuance of an order of the court, against the distributees. David v. Frowd, 1 Miln. and Keen, 200; Greig v. Somerville, 1 Russ. and M. 338; Gillespie v. Alexander, 3 Russ. 130; Sawyer v. Bichmore, 1 Keen, 391; Shine v. Gough, 1 Ball. and B. 436; Finley v. Bank of the United States, 11 Wheat. 304; Story's Eq. Pl. § 106, Wiswall v. Sampson, 14 How. 52, 67.

The general principle governing courts of equity, in proceedings of this description, is more clearly stated by Sir John Leach, master of the rolls, in David v. Frowd, above referred to, than in any other case that has come under our notice.

That was a case where one of the next of kin, who had no notice of the administration suit, filed a bill against the administratrix and distributees to obtain her share of the estate. The bill was filed some two years after the decree for distribution had been made and carried into effect.

The master of the rolls observed, that "the personal property of an intestate is first to be applied in payment of his debts, and then distributed among his next of kin. The person who takes out administration to his estate, in most cases, cannot know who are his creditors, and may not know who are his next of kin; and the administration of his estate may be exposed to great delay and embarrassment. A court of equity exercises a most wholesome jurisdiction for the prevention of this delay and embarrassment, and for the assistance and protection of the administrator. Upon the application of any person claiming to be interested, the court refers it to the master, to inquire who are creditors, and who are next of kin, and for that purpose to cause advertisements to be published in the quarters where creditors and next of kin are most likely to be found, calling upon such creditors and next of kin to come in, and make their claims before the master, within a reasonable time stated; and when that time is expired, it is considered that the best possible means having been taken to ascertain the parties really entitled, the administrator may reasonably proceed to distribute the estate among those who have, before the master, established an apparent title. Such proceedings having been taken, the court will protect the administrator against any future claim."

" But it is obvious," he remarks, " that the notice given by adver-
tisements may, and must in many cases, not reach the parties
really entitled. They may be abroad, and in a different part of
the kingdom from that where the advertisements are published,
or, from a multitude of circumstances, they may not see or hear
of the advertisements, and it would be the height of injustice
that the proceedings of the court, wisely adopted with a view
to general convenience, should have the absolute effect of con-
clusively transferring the property of the true owners to one
who has no right to it."

The master of the rolls further observed, " that if a creditor
does not happen to discover the proceedings in the court, until
after the distribution has been 'actually made, by the order of
the court, amongst the parties having, by the master's report, an
apparent title,—although the court will protect the administra-
tor, who has acted under the orders of the court,— yet, upon a
bill filed by this creditor against the parties to whom the prop-
erty has been distributed, the court will, upon proof of no
wilful default on the part of such creditor, and no want of
reasonable diligence on his part, compel the parties, defendants,
to restore to the creditor that which of right belongs to him."
The master of the rolls then applied this principle to the right
of the next of kin, the complainant in the bill, and observed,
" that it had been argued that the case is extremely hard upon
the party who is to refund, for that he has a full right to con-
sider the money as his own, and may have spent it; and that
it would be against the policy of the law to recall the money,
which the party had obtained by the effect of a judgment upon
a litigated title. But, he observed, there is here no judgment
upon a litigated title ; the party who now claims by a para-
mount title was absent from the court, and all that is adjudged
is, that, upon •an inquiry, in its nature imperfect, parties are
found to have a *primâ facie* claim, subject to be defeated upon
better information. The apparent title, under the master's
report, is, in its nature, defeasible. A party claiming under
such circumstances, has no great reason to complain that he
is called upon to replace what he has received against his
right."

In the case of Gillespie *v.* Alexander, also above referred to,
Lord Eldon observed, that, although the language of the de-
cree, where an account of debts is directed, is, that those, who
do not come in, shall be excluded from the benefit of it; yet
the course is to permit a creditor, he paying costs, to prove his
debt, as long as their happens to be a residuary fund in court,
or in the hands of the executor, and to pay him out of the
residue. If the creditor does not come till after the executor

has paid away the residue, he is not without remedy, though he is barred the benefit of that decree.    If he has a mind to sue the legatees, and bring back the fund, he may do so, but he cannot affect the legatees, except by suit, and he cannot affect the executor at all.

These principles are decisive of this branch of the case, as they establish, beyond all controversy, the right of the administrator to assert the title of Williams, the intestate, to the proceeds of the share in question, notwithstanding the decree of distribution by the Baltimore county court.    There has been no laches, on his part, or, on the part of those whom he represents.

The cases above referred to relate to the rights of creditors, and next of kin; but the principle is equally applicable to all parties interested in a common fund brought. into a court of equity for distribution amongst the several claimants.

It is worthy of observation in this connection that. the decree, however conclusive in its terms, in the distribution of the fund amongst the apparent owners then before the court, possesses no binding effect upon the rights of the absent party, whose interests have not been represented on the subject of litigation. The opinion of the court given, and decree in pursuance thereof, applies only to interests of those amongst whom the fund is distributed.

These observations furnish an answer to the argument on behalf of the appellees, drawn from a reference to the terms of the decree of the court of appeals of Maryland, in this case, by which the fund is adjudged to the executors of Oliver.    As between all the parties then before the court, this adjudication was doubtless proper, and conclusive upon their rights.

It is agreed in the case, that but five eighths of the fund in controversy is in the hands of the executors, the residue having been paid over in the administration of the assets of the estate.

If this portion had been paid over by the executors in pursuance of an order of the court in an administration suit, the defendants would be protected to that extent, and the complainant compelled to proceed against the distributees.    But no such fact appears in the case.

Without saying, at this time, that an executor, in all cases, may be compelled to account to a party making title to a portion of the estate, after distribution. among the legatees and next of kin, unless first procuring an order of the court having charge of the administration, we perceive no reason, under the circumstances of this case, for exonerating them, or turning him round to a bill against the distributees.

Upon the whole, after the fullest consideration we have been

22 *

able to give to this case, we think the decree of the court below
was erroneous, and should be reversed.

Mr. Chief Justice TANEY, Mr. Justice McLEAN, and Mr.
Justice DANIEL dissented.

John S. Williams, administrator of
  James Williams, dec'd appellant,
            *v.*
Robert M. Gibbes and Chas. Oliver,
  ex'ors of Robert Oliver, deceased.

And

John Gooding, Junior, administrator
  *de bonis non* of John Gooding,
  deceased, appellant,
            *v.*
Robert M. Gibbes and Chas. Oliver,
  ex'ors of Robert Oliver, deceased.

Appeals from the circuit
court of the United States
for the district of Mary-
land.

Mr. Chief Justice TANEY dissenting.

I dissent from the opinion in these two cases; but they are so
intimately connected with the case against Lyde Goodwin's
administrator, just decided, that I shall be better understood by
considering the three together.

When the case of Gill (who was trustee of Goodwin under
the insolvent laws of Maryland) against Oliver's executors was
before the court, I did not concur in the judgment then given,
as will be seen by the report of the case in 11 Howard's
Reports, 529. It appeared to me unnecessary at that time to
do more than simply express my dissent; but the course which
these cases have since taken, and the decisions now given, make
it my duty to state more fully my own opinion, and the grounds
upon which I passed the decrees that are now before the court.

The history of the controversy is this: Goodwin, Gooding,
and Williams, were members of the Baltimore Mexican Com-
pany, which made the contract with Mina, in 1816. The char-
acter of that contract is fully stated in the eleventh and twelfth
volumes of Howard's Reports, and also the manner in which it
came before the commissioners under the treaty with Mexico,
and their award upon it.

The commissioners awarded the sum mentioned in their
award to the Mexican Company of Baltimore, as due " for arms,
vessels, munitions of war, goods, and money furnished by the
company to General Mina for the service of Mexico in the years
1816 and 1817," and gave interest to the company according to

the stipulation in the contract with Mina.  I have given the words of the award, because they show that the commissioners affirmed the validity of this contract, and directed the amount due by its terms, to be paid to the trustees therein named, for the benefit of the parties interested in it.

Proceedings were soon after instituted in a Maryland court of equity, against the trustees by persons claiming an interest in the fund ; and the money by order of the court was brought into court to be distributed among the parties entitled.   Many claimants appeared, presenting conflicting claims for shares in the company.

Goodwin, Gooding, and Williams, all became insolvent.  Goodwin in 1817, Gooding and Williams in 1819 ; and their respective trustees appeared in the Maryland court, and claimed the amount due to the insolvent.

On the other hand, the executors of Oliver claimed these three shares.  Goodwin's under an assignment made to Oliver by Goodwin in 1829, and the other two under assignments made to him in 1825, by George Winchester, who was the trustee of each of them.

The controversies which arose upon the distribution of this fund were removed to the Maryland court of appeals, which is the highest court of the State.   And in the trial there, it was objected that the contract with Mina was in violation of law, and therefore fraudulent and void, and vested no rights in the members of the company which the law would recognize, and consequently that no right of property in it could vest in the trustee when the party became insolvent.

It may be proper to remark, that under the Maryland insolvent law, all the property, rights, and credits belonging to the insolvent at the time of his petition, become vested in his trustee : and he at the same time executes a deed to the trustee, conveying and assigning to him all his property, rights, and credits of every description for the benefit of his creditors.   And if the persons above-named, at the times of their petitions in 1817 and 1819, had any interest whatever, either legal or equitable, vested or contingent, under this Mexican contract, it passed to their trustees.

The court of appeals decided that the contract with Mina was fraudulent and void under our neutrality laws, and therefore vested no right in the parties which a court of justice in this country could recognize, and, consequently, that they had no interest or property under it which could be transferred to or vest in their trustees at the time of their insolvency.   And upon this ground they decided against the claim of the trustees, and directed the whole amount of the three shares to be paid to Oliver's executors.

The ground upon which they supported the claim of Oliver's executors to these shares is not stated fully in the opinion. It was, I presume, upon the ground that, by the terms of the award, the shares of these three persons were received by the trustees named in the award, in trust for these executors; and that the trustees, therefore, had no right to withhold it from them; as neither they nor their testator had any participation in the fraudulent contract out of which it had arisen. And if the court was right in deciding, that neither the trustee of the insolvent nor any one else could derive a title to this money under the contract with Mina, perhaps the language of the award, together with the documents referred to in it, might justify this decision. But I express no opinion on this point, and merely suggest it in justice to the court of appeals, in order to show that their opinions in these cases are not necessarily inconsistent with each other, although the court may have reasoned erroneously, and decided incorrectly.

These decisions were brought to this court by the trustees of the insolvents, by writs of error under the 25th section of the act of 1789. Motions were made in each of them to dismiss for want of jurisdiction; and the motions were sustained by the majority of the court, and the cases dismissed, as will appear in the reports referred to.

I differed in opinion from the court; but undoubtedly, when the cases came before me at circuit, upon bills filed by the administrators, it was my duty to conform in the inferior court to the decision of the superior, as far as that decision applied to the case presented by these complainants. It is true, that in my own opinion, and according to the views of the subject I had always entertained, these bills, by the administrators of the insolvents, could not be maintained. But I dismissed them, not only upon that ground, but also under the impression that I was bound to do so upon the principles upon which this court had decided them in the suits by the trustees. It appears, however, by the opinion just delivered, that I was mistaken, and placed an erroneous construction on the opinions formerly delivered. It seems, therefore, to be due to myself to state not only my opinion in the former cases, but also the interpretation I placed upon the language of this court in deciding them. And I think it will be found that the language of the former decisions was fairly susceptible of the construction I put upon it, although that construction has turned out to be erroneous. I do not mean to say that the construction which the majority of the court puts upon its former decisions now, is not the true one; but that the language used in it might lead even a careful inquirer to a contrary conclusion.

I proceed, in the first place, to speak of the case of Gill, trustee of Lyde Goodwin. As I have already said, when that case was before this court, I thought, and still think, we had jurisdiction; and proceed now to state the grounds of that opinion, and how it bore on the decision of the suit by his administrator, which is now before us.

The money in dispute was claimed under the contract with Mina. And the amount claimed was awarded to the Mexican Company, or their legal representatives or assigns, by the commissioners appointed under the Mexican treaty, and the act of congress passed to carry it into execution. The commissioners were authorized to ascertain and determine upon the validity of the claims of American citizens upon the Mexican government, and for which this government had demanded reparation. Of course, it was their duty not to allow any claim for services rendered to Mexico, or money advanced for its use, by American citizens in violation of their duty to their own country, or in disobedience to its laws. For the government would have been unmindful of its own duty to the United States, if it had used its power and influence to enforce a claim of that description, or had sanctioned it by treaty. But the board of commissioners were necessarily the judges of the lawfulness of the contracts, and the validity of the claims presented. They were necessarily to determine whether they were of the description provided for in the treaty or not. They may have committed errors of judgment in this respect, and may have committed an error of judgment in sanctioning the contract with Mina. But the law under which they acted made them the exclusive judges on the subject. There was no appeal from their decision. And if there was no mal-practice on the part of the commissioners, and the award was not obtained by fraud and misrepresentation, it was final and conclusive. It was like the judgment of any other tribunal having jurisdiction of the subject-matter, and could not be reëxamined and impeached for error of judgment in any other court which had no appellate power over it. And they decided that the contract of Mina was valid, and consequently it vested from its date a lawful right to the money in the member of the Mexican Company.

The objection, therefore, in the Maryland court, brought into question the validity of an authority exercised under the United States; and as the decision of the state court was against its validity, it was my opinion that a writ of error did lie under the 25th section of the act of 1789. And regarding the award as final and conclusive upon other tribunals, there was error in the judgment of the state court which pronounced it invalid and fraudulent. It will be observed that this error was the founda-

tion of the judgment of the state court. For if the court did not look behind the award, and had regarded the contract as valid, the right to Goodwin's interest undoubtedly passed to his trustee in 1817, long before his assignment to Oliver. I therefore thought this court had jurisdiction, and that the judgment of the court of appeals ought to be reversed, and this money paid to the trustee, and not to Oliver's executors.

The majority of the court, however, entertained a different opinion, and dismissed the cases, upon the ground, as I understand the opinion, that the construction of the treaty, or of the act of congress, or the validity of the authority exercised under them, did not appear to have been drawn into question in the court of appeals; and that the case appeared to have been decided upon the effect and operation of their own insolvent law, and upon their own laws regulating contracts and transfers of property and credits within the State, over which we had no jurisdiction upon the writ of error; that these matters were exclusively for the decision of the state tribunals, and their decision final upon the subject.

Some remarks are made in the opinion in relation to grounds upon which the state court might have decided without impeaching the award of the commissioners; and among others, the fact that Goodwin had assigned his right to Oliver in 1829, and that the Mexican congress had previously, in 1825, acknowledged its validity. There is an error in the date, but it is immaterial. The acts of the Mexican congress were in 1823 and 1824.

But I did not understand these remarks as intended to affirm that the share of Goodwin passed to Oliver by this assignment, but as suggesting grounds upon which the state court might, whether erroneously or not, have decided in favor of the executors. Because, as the court held that it had no jurisdiction in the case, I supposed that it intended to give no opinion upon the merits. And I presumed that it did not intend to decide that the acknowledgment of Mexico, that Mina's contract was binding upon the republic, could give any validity to it in the courts of the United States. For the contract of the Baltimore Company would have been liable to the same objections if it had been made originally, in 1816, with the Mexican government instead of General Mina. And if it was void in 1817, and Goodwin then had no interest under it it was equally void in 1829, when the assignment to Oliver was made; and it is due to the court of appeals to say, that they have not indicated, in any of their opinions, that the acts of the Mexican congress had any influence on their judgments.

Upon these considerations I dismissed the bill at circuit, upon

two grounds : 1. My own opinion is, that the interest of Goodwin passed 'to his trustee, and consequently that the present complainant (his administrator) can have no title.. 2. This court decided, upon a view of the whole case, that it had no appellate power over this judgment, and that it had been decided by the Maryland court upon its own construction of its own laws. And that point being adjudged by this court, I did not see upon what ground I could, in conformity to this opinion, revise the judgment of the state court and reverse its decision. It would, in substance, have been the exercise. of an appellate power at circuit over the decisions of the state courts, upon their own laws, which this court had refused to exercise on writ of error; and, for the reason first above-stated, I now concur in affirming the judgment here in the case of Goodwin's administrator.

I come now to the cases of the administrators of Gooding and Williams, which are, in many respects, alike. These writs were also dismissed for want of jurisdiction, when formerly before the court; and in dismissing them, the court said that the title of the trustees to the shares of Gooding and Williams, · "involved only a question of state law, and therefore was not the subject of revision here, and was conclusive of his rights, and decisive of the case." I quote the language of the court. The want of jurisdiction was, therefore, the only point decided in these cases, and they were dismissed on that ground.

It is true that in these cases, as well as in that of Goodwin's trustee, language is used, in the opinion of the court, which would seem to imply that the court was of opinion that the contract was void originally, but had afterwards become valid by the events referred to in the opinion. But I understood these observations, as I did those made in Goodwin's case, merely as suggesting considerations which might have led to the decision of the state court, without impeaching the award of the commissioners, but not as approving or sanctioning them as sufficient grounds for their decree. For the court determined that it had no jurisdiction, and consequently the merits of the case were not before it, and I presumed it did not mean to express any opinion concerning the correctness or incorrectness of the judgment of the state court. Such I have understood to be the established practice of this court, and I was not aware that this case was intended to be an exception. The only point decided was the conclusiveness of the judgment of the state court upon the rights of the trustees.

The court of appeals assigned two reasons for their decision, and taking them literally, as they stand, they are inconsistent with each other. But the opinion appears to have been hastily

written, and not sufficiently guarded in its words; and it is evident they meant to say, that, in the opinion of the court, no interest vested in the trustee, because there was no legal or equitable interest acquired by the contract that could vest anywhere, or in any person. But, if there was a legal interest, it passed to his trustee, and by his assignment vested in Oliver. This mode of decision upon alternative grounds, is an ordinary and familiar one in courts of justice, and will often be found in the decisions of this court.

And however the reasoning of the state court may be regarded, it is clear that, with the interest of the intestate before them and under consideration, they decreed that the shares belonged to Oliver's executors. Now it it is perfectly immaterial whether the reasons assigned by the court were right or wrong. Here is their judgment, their decree—a decree founded altogether on state laws, as this court have said in their former decisions, and made by a court of competent jurisdiction. Upon what principle, then, can a court of the United States, either at circuit or here, undertake to revise it or reverse it for error? If we had no appellate power upon the writ of error, and no right to reverse the judgment for errors supposed to be committed by the state court in interpreting and administering its own laws, how can this court or the circuit court exercise this revising power over the judgment in the form it now comes before us. It is doing in another way what it is admitted cannot be done in the prescribed mode of proceeding by writ of error. And I am not aware of any precedent for this exercise of power in a court of the United States administering state laws, when the judgment of the highest court of the State is before them upon the same case upon which the United States court is called on to decide.

It will be remembered that the appellate and revising power of the courts of the United States over the judgments of state courts stands upon very different principles from those which, in England, govern the relation of superior and inferior tribunals, and they are not, therefore, always safe guides upon the revising and reversing power which the courts of the United States may constitutionally exercise over the judgments of state courts.

I know it is said that the administrators of these insolvents who have filed these bills were not parties to the former proceedings, and are not therefore estopped by the decree of the court of appeals And a good deal of argument has been offered to maintain that proposition; but that question cannot arise until other questions which stand before it and control it are first disposed of. For this court held, upon the former writs of error, that these cases were decided by the court of appeals exclusively upon Maryland law; and, if that be the case, before we come

Williams *v.* Gibbes et al.

to the question of parties, other questions must be decided:
1. Whether in this form of proceeding you can examine into
the validity of the grounds upon which the state court decided
them, and reverse its judgment if you suppose it committed
an error in interpreting and administering its own laws; and,
if you are authorized to do this, then, 2. Did it commit an
error in deciding that those shares belonged to Oliver's executors? The reasons they may have given for this opinion are
altogether immaterial; and if these two questions are decided
in the affirmative, and this court reverses the judgment, upon
the ground that the shares belonged to the insolvents at the
times of their death, and not to Oliver's executors, then the
administrators would undoubtedly have an interest, and are not
estopped by the former decree from claiming their rights. Nobody, I presume, disputes this. But, before you come to this
part of the case, you must take jurisdiction over the judgment
of the state court, and reverse it for error. Because, if that
judgment stands, then the intestates had nothing at the times
of their death that could pass to the administrators; and there
would have been no more propriety in making them parties,
than any other stranger who had no interest in the fund. The
administrator of a vendor who has in his lifetime divested himself of all right to property, can hardly be supposed to be a
necessary party in a controversy between purchasers under him
when neither of the claimants has a right to fall back for indemnity on his estate. The administrators offer no new evidence
of interest in them or their intestates, but present here the identical case, in all its parts, that was before the court of appeals
when it passed its decree.

Indeed, I cannot comprehend how the state court, or this court,
can award the fund to the administrators, if the contract was
fraudulent and void when the parties became insolvent. They
both died before the award was made; but if, up to that time, the
contract continued open to examination in a court of justice, and
was decided to have been fraudulent and a nullity when made,
nothing afterwards could have given it legal existence. *Nihilum
ex nihilo oriatur* is as true in law as in philosophy. If void at
first, it continued to be void and a nullity to the time of the deaths
of the parties, and their administrators could derive no lawful
title from them. To say that a legal or equitable interest in a
fraudulent contract can exist in a party and be transmitted to
his administrator, when used as legal language, is a solecism.
And if from necessity, upon any principle of law or equity,
the award related back, it would seem that those who purchased
the interest in these shares, at their full market value at the time,
and paid for it, should have the benefit of the relations.

It may be said, perhaps, that although the acts of congress of Mexico, in 1823 and 1824, could not make valid a contract originally void and a nullity by our laws, yet these acts of the Mexican legislature constituted a new and original contract which at that time might lawfully be made by our citizens, and that the rights of the parties take date from that contract. But this view of the case would not obviate the legal objections, but on the contrary it would add to them. For it still assumes the principle that the state court had a right to examine into the testimony, not only to determine the rights of the parties under the award, but to impeach the award itself. And upon this theory, if they had not found these acts of the Mexican congress in the proceedings of the commissioners, the state court might have held the whole award erroneous and a nullity, vesting no rights in any one, because it sanctioned an illegal contract. As I have already said, a state court, in my judgment, has no such power.

The commissioners do not refer to the Mexican acts of congress, nor allow the claims of the company upon a contract made by these laws. They award expressly upon the contract with Mina, and give interest according to that contract. And unless their award may be impeached for error, and their decision upon the claim reëxamined and reversed in the state court, the rights of all the claimants depend upon this contract, and take date from it. According to the award of the commissioners, it is this contract that gave the claimants rights, and which must consequently govern the court in distributing the fund.

It seems to be supposed that the decision of the court of appeals declaring this contract to be fraudulent and void was founded upon some local law of the State. But that is evidently a mistake. It was founded on the breach of the neutrality laws of the United States. They looked behind the award of the commissioners, behind an authority exercised under the United States, and impeached its validity.

Besides, no other contract but this was under examination in the state court. The court speak of no other in their opinion. The parties, as appear by the proceedings, all claimed under it, and the decisions of the court and the distribution of the fund were founded upon it. Can another and a subsequent contract be set up here, upon which the state court has passed no judgment, and has not acted, and under which none of the parties before it claimed? I think not. And if their decision is to be set aside for error, it must, I presume, be for error in deciding upon the contract brought before them by the parties. And if this court now reverse these decrees upon the ground that the original contract with Mina was void, but became valid by sub-

sequent events, it reverses upon a new case, upon which the state court has never decided. Moreover, it unsettles the whole proceedings in the state court, for the interest of the claimants, in almost every instance, depended upon the time that a lawful right to this claim vested in the company.

And, if, notwithstanding these objections, this court may look into the judgment and reverse it for error, and they find it to have been decided upon two principles of law, consistent or inconsistent with each other, one of which is erroneous and the other sound, ought not the judgment to be affirmed?·

Now, as I have already said, the state court committed an error, in my opinion, in going behind the award, and receiving testimony to show that a contract was fraudulent and void which a tribunal of the United States having exclusive jurisdiction over the subject had decided to be lawful and valid. And if this court have the power to revise that judgment, I think it could not be supported on that ground.

But they put it upon another, and say, that if the original contract is regarded as valid, then the interest of the insolvents passed to their trustee, and, by virtue of his assignment, vested in Robert Oliver.

Now, in examining the judgment of an inferior tribunal in a case of this description, would the appellate court lay hold of the erroneous principle to reverse the judgment? Would they not affirm it upon the other alternative, which placed it upon lawful and tenable grounds? I think nobody would doubt that the judgment would be affirmed. Ought not the same rule to be applied to the Maryland judgment which this court is now revising? And is not this court bound, under the award of the commissioners, to regard the original contract as valid, when it has been so decided by a lawful tribunal of the United States, having exclusive jurisdiction over the subject? If we are so bound, and not authorized to impeach the judgment of the commissioners, then the judgment of the Maryland court, in the cases of Gooding and Williams, is right, and ought to be affirmed upon the second ground stated in the opinion, even if we were sitting here as an appellate tribunal.

It is true that the bill in the case of Williams's trustee was filed in the state chancery court, which, by a change of the law, represents the court where the fund was originally paid in and distributed among the claimants; and was removed to the circuit court of the United States by the appellees, who reside out of the State. And undoubtedly, the circuit court, in that state of the case, possessed the same power over it, and were bound to decide it upon the same principles that ought to have governed the state court in which the bill was filed. But there

was no new evidence, no new fact, no new interest or equity porsented. There is a new name, indeed, but no new interest or equity disclosed in the bill. And upon that case the court of appeals had passed its decree. That decree was the law of the case, in the inferior court, where this bill was filed. And the court of appeals itself could not reverse its decree, signed and enrolled at a former term, nor open it merely because a new name was before them, which, according to its former decree, had no interest in the fund, and consequently ought not to have been made a party in the former proceedings. And if we now reverse this judgment, we go further than the Maryland court of appeals could have gone, and exercise what is essentially an appellate power over it, correcting the errors of an inferior court.

But in Gooding's case this court go still further. The bill in this case was filed originally in the circuit court of the United States. Yet the fund was never in that court, nor the money paid to the appellees by its order. If the decree is to be opened for error, aft r the fund is distributed by order of a court of competent jurisdiction, ought it not to be done in the court that passed the decree? And can a circuit court of the United States compel the appellees to repay money which they hold under the decree of a court of coördinate jurisdiction, made upon the same case, with the same evidence before them? I think not.

Besides, Gooding became insolvent again in 1829. All the property, rights, and credits which he had at that time, vested in his trustees, who are still living. If Goodwin's interest in 1829 had become so far valid that it could pass by his assignment to Oliver, why is not Gooding's also lawful and vested in his trustees? Upon what principle can Goodwin's interest be capable of assignment in 1829, and Gooding's remain fraudulent until his death? Yet if it was capable of assignment in 1829, the complainant is not entitled. It passed to his trustees.

And if, as the court now say, Goodwin would be estopped from impeaching his assignment to Oliver on the ground that the original contract was illegal and fraudulent, why are not Gooding and Williams, and their administrators, equally estopped from impeaching their assignments to their respective trustee? The assignment to the trustee for the benefit of their creditors was equally meritorious with Goodwin's assignment to Oliver. And if they had appeared as parties in the Maryland court, would they have been permitted to impeach the title of the trustee, who was then claiming it, and set up a right to the money in themselves, upon the ground that the contract of their respective intestates was fraudulent? Certainly, the principle

is well established in chancery that a party cannot set aside a contract upon the ground that he himself was guilty of a fraud in making it. I do not cite cases to prove familiar doctrines. His administrator is in no better condition. And yet he is allowed, in this case, to defeat the operation of the intestate's deed to the trustee, upon the ground that the contract, of which the trustee claims the benefit, was a fraudulent one on the part of his intestate. And here, in a court of equity, these administrators support their title and recover this money against their trustees, as well as Oliver's executors, solely upon the ground that their intestate was guilty of a fraud in making the contract with Mina, and incapable, therefore, of assigning it. The party defeats the operation of his own deed, upon the ground that he himself committed a fraud. This doctrine cannot, I think, be maintained, upon principle or authority, in a court of chancery.

We are not dealing with Mexican laws, or inquiring what a Mexican tribunal or the Mexican government would decide in relation to this contract, but we are inquiring how it stands in a Maryland court, and what are the legal rights under it by the laws of Maryland. And I understand this court to place its opinion solely upon the ground that this contract was fraudulent and void by the laws of Maryland, and that the parties acquired no rights under it.

It may have been good in Mexico ; a valid, binding obligation. They may have been willing to reward our citizens for a breach of duty to their own country ; but that could not cleanse it from the offence against our own law, nor give legal rights to the administrator, when there was no right in the intestate. The courts of the United States can hardly be authorized to sanction and enforce what are called honorary obligations of a foreign nation, when those obligations have arisen from temptations offered to our own citizens to violate the laws of their own country. Nor can I perceive how the opinion of the Maryland court, declaring this contract to be fraudulent and void, can be binding and conclusive upon this court, and yet every other decision of the same court, in the same case, explaining or qualifying this opinion, still be open to examination and reversed for error. I cannot, for myself, draw any line of distinction between the relative conclusiveness of the opinions the state court expressed, when all of them were equally within its jurisdiction and depended altogether upon the laws of the State ; and all upon points necessarily arising in the case they are then deciding.

When these two cases were before the court, upon writs of error brought by the trustees, I entertained the opinions I now express. I then thought that the court had jurisdiction, upon

23*

the ground that the validity of the act of the Maryland legislature of 1841, confirming a certain description of conveyances made before that time by the trustees of insolvent debtors, was drawn into question, as contrary to the constitution of the United States, and their decision had been in favor of the validity of the state law. And I still think so. But at the same time I was of opinion that the law in question was valid, and that although we had jurisdiction, the judgment of the state court in these two cases ought to be affirmed, and the writs of error not dismissed. For the trustee in whom the shares vested, according to the opinion I have expressed as to Goodwin's case, had transferred them to Oliver, and the state court was therefore right in decreeing them to Oliver's executors. The majority of this court thought otherwise, and dismissed them for want of jurisdiction. And I did not state my dissent, because, as I then understood the opinion, the dismissal finally disposed of them.

It was upon the grounds above stated that I decided these cases at the circuit, and supposed, at the time I was deciding them, in conformity to the opinion of this court upon the conclusiveness of the judgment of the state court. The judgment just pronounced, however, shows that so far as the shares of Gooding and Williams are concerned, I misunderstood the opinion of the majority of this court. But with all the habitual respect which I feel for the judgment of my brethren, the opinion I held at the circuit remains unchanged. And I have the more confidence in it, because this court, now, as heretofore, have said that the questions in dispute depend altogether on Maryland law; and every judge in Maryland who has been called upon to hear and decide the cases of Gooding and Williams, of which I am now speaking; the judge of the court of original chancery jurisdiction, the judges of the court of appeals, all men of high legal attainments and eminence; have clearly and unanimously held, upon the same proofs now before us, that the executors of Oliver were entitled to these two shares in the Mexican Company, and decreed that the money should be paid to them. And no one of these judges deemed it necessary that the administrators should be parties, or called before the court; acting no doubt upon the established rules of chancery, that a person who has no interest in the fund need not and ought not to be made a party; and that the administrators could have no interest, as the intestates themselves had none at the times of their respective deaths. And that if they were before the court, they could not be allowed to impeach the deed to the trustees by alleging that their intestate had committed a fraud in making it.

I must, therefore, adhere to the opinions I entertained when the cases were before me at circuit, and dissent from the

opinion just pronounced, in the cases of Gooding's and Williams's administrators, and concurring in that of Goodwin's administrator, for the reasons hereinbefore stated.

John S. Williams, administrator of
James Williams, deceased, appellant,

*v.*

Robert M. Gibbes and Charles Oliver,
executors of Robert Oliver, deceased.

and

John Gooding, jr., administrator *de
bonis non* of John Gooding, deceased,
appellant,

*v.*

Robert M. Gibbes and Charles Oliver,
executors of Robert Oliver, deceased.

Appeals from the circuit court of the United States for the district of Maryland.

Mr. Justice DANIEL dissenting.

When, at a former term, these cases were brought before this court, in the name of Nathaniel Williams, trustee for the creditors of James Williams, an insolvent debtor, and of the same Nathaniel Williams, as trustee for the creditors of John Gooding, an insolvent debtor, the court, after argument and upon full consideration, dismissed them for the want of jurisdiction. The decision of the court then pronounced, commanded my entire concurrence. I still concur in that decision, and hold the reasons on which it was founded as wholly impregnable. Those reasons were specifically these: That the questions involved in the cases were purely questions arising upon the construction of the insolvent laws of Maryland; questions properly determinable, and which had been determined by the highest tribunal of that State; and such, therefore, as vested no jurisdiction in this court.

Such, then, being directly and explicitly the decision of this court, as will be seen in the report of its decision in 12 How. 111, 125, it becomes a matter for curious speculation to inquire by what view of the facts and the law of these cases, by what process of reasoning upon the same facts and the same law, this court have now arrived at a conclusion diametrically opposed to that which had been formerly reached by them. The parties in interest are essentially the same, varied only in name; it is the same insolvent law of Maryland which it is now, as it formerly was, undertaken to interpret; and it is the identical exposition of the identical court, formerly examined and sanctioned here, which this tribunal now assumes the right to reject and condemn.

Indeed, the field for discussion and criticism is now much more narrow than was that which existed when these cases were formerly before this court. At that time there were strenuously urged grounds for contestation, founded upon an alleged construction of the Mexican treaty, and of the acts· of the commissioners under that treaty. At present, the claims of the appellants, and the impeachment by them of the decision of the state court, and of that of the circuit court of the United States, have been rested chiefly, if not exclusively, upon the fact, that the personal representatives of the insolvent assignors were not made parties to the suits brought for the distribution of the effects of the insolvents.

It cannot be correctly insisted on as a universal or necessary rule, that in suits by assignees the assignors from whom they derive title must be made parties. Cases may occur in which there may be a propriety of joining the assignors in such suits, but, without some apparent cause for such a proceeding, the rule and the practice are otherwise. Indeed, the calling into a controversy or litigation a person who can have no interest in such litigation, would be discountenanced by the courts, who would dismiss him from before them at the costs of the person who should have attempted such an irregularity. And it would seem that, if there could be a case in which such an attempt would be irregular, it would be that in which the person so made a party, had not, and could not have, any interest in the controversy; in other words, should be an insolvent, who had transferred upon record every possible interest he possessed in the matter in controversy. But suppose it be admitted as the general rule, that an assignee should, in the prosecution of an assigned interest, call in his assignor as a voucher, or for any other purpose, how will these cases be affected by such an admission?

The absence of the personal representatives of the' insolvent assignors is the only circumstance imparting a shade or semblance of difference between the attitude of these cases as formerly brought ·before us, and that in which they are now presented. Of what importance, either now or formerly, could be the presence or absence of the personal representatives of these insolvents, it might puzzle Œdipus himself to divine. The rights or interests of the representative can never be broader than are those of the person represented; and as the persons represented in these cases are admitted on all sides, and are shown upon record, to have nothing, by reason of the transfer to their trustees of all that they had ever possessed, or to which they had any claim — and that, too, by a mode of transfer which declared the inadequacy of their all for the

liquidation of their debts — it followed, that those who came forward under these insolvents, *jure representationis,* merely, could themselves be entitled to nothing, by representation, from their principals, nor claim any thing in opposition to the universal and absolute assignments to the trustees of those debtors.

Had these personal representatives of the insolvents been made parties to the suits for distribution, it is probable that they would have been regarded by the court as mere men of straw, used for the purpose of depriving the purchasers, for valuable consideration, from the trustees or assignees of the insolvent's interests, deemed, at the time of the sale by the trustees, precarious and contingent, but which the progress of events had subsequently rendered available.

But whatever may be admitted as the general rule applicable to suits by an assignee; however that rule may be supposed to require that in such suits the assignor, or his representative, should be a party, still, we are brought back to the true character of these cases, and of the rule of law peculiarly applicable to them, namely, that they are controversies depending upon the construction of the statutes of Maryland, which regulate the administration of the effects of insolvent debtors. That, in the construction of those statutes, it has been, by the supreme court of the State, decided, that in suits by the purchasers or assignees from the statutory trustees of insolvent debtors, the personal representatives of those insolvent debtors are not necessarily to be made parties, but that such suits may be prosecuted and decided without participation or interference on the part of such representatives; that in conformity with this construction of the statute of Maryland, by the supreme court of the State, the circuit court of the United States for the district of Maryland, and this court, in the cases herein mentioned, have concurrently ruled in direct opposition to the pretensions of the appellants now advanced.

Regarding the decision just pronounced as in conflict with all that has been heretofore ruled upon the subjects of this controversy, and as transcending the just authority of this court to reject the construction of the statute of Maryland proclaimed by the supreme court of that State, I am constrained to declare my dissent from the decision of this court, and my opinion that the decrees of the circuit court, in these cases, should be affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Maryland, and was argued by counsel; on considera-

tion whereof it is now here ordered, adjudged, and decreed by this court, that the decree of the said circuit court in this cause be and the same is hereby reversed with costs, and that this cause be and the same is hereby remanded to the said circuit court for further proceedings to be had therein in conformity to the opinion of this court.