WILLIAM H. DUNBAR & others *vs.* REUBEN BROOMFIELD & others.

Suffolk.    October 19, 1923. — January 5, 1924.

Present: BRALEY, DeCOURCY, CROSBY, & CARROLL, JJ.

*Contract*, Construction, Performance and breach.  *Trust*, Construction of instrument creating trust.  *Equity Pleading and Practice*, Parties.  *Equity Jurisdiction*, To enforce for benefit of a trust liability of subscribers to a contract in writing which was the basis of the trust.

By an instrument under seal certain individual subscribers agreed with the mortgagees of a parcel of real estate, who were about to foreclose their mortgages, that they would pay arrearages due upon the mortgages and would repay certain sums advanced by the mortgagees to protect their interests, and that they would form a real estate trust with certain designated trustees who would take over the real estate and develop it along designated lines; and they further agreed severally and not jointly to "subscribe in cash as the capital of said Real Estate Trust, the sum of $1,900,000; " the mortgagees were to extend the mortgages; the trustees were to be under no liability as trustees or individually beyond the extent of the trust assets.  The real estate trust was formed, the subscribers causing the real estate to be conveyed to the designated trustees and themselves being named in the trust instrument as the " *cestuis que trust*," and the mortgagees indorsed thereon a statement that the " foregoing is the real estate trust organized pursuant to the requirements of " the extension agreement.  Only one of the subscribers affixed his signature to the trust instrument.  The payment of amounts already due upon the mortgages was made as designated, a part of the $1,900,000 subscribed was paid by the subscribers, and certificates were issued to the subscribers as *cestuis que trust*.  The development of the real estate proceeded and the trustees

under the terms of the trust incurred obligations. At a time when there were arrearages of payments under the mortgages and large sums due to contractors for work in the development of the property, the mortgagees foreclosed and the equity of redemption in the real estate was sold. The trustees brought a bill in equity against the subscribers and the mortgagees to require the subscribers to pay the unpaid balance due on their subscriptions under the extension agreement, alleging that the mortgagees were joined as defendants not for the purpose of relief but in order that they might be bound by any decree entered in the suit. No cross bill was filed. *Held,* that

(1) It was not necessary to consider what the rights of the mortgagees would have been if the subscribers had done nothing after the execution of the extension agreement;

(2) The indorsement made by the mortgagees upon the trust instrument did not make them parties to the declaration of trust;

(3) In the absence of a cross bill, the question, whether the mortgagees could reach the assets of the trust in satisfaction of their demands or compel the subscribers to pay, could not be determined;

(4) The provisions of the extension agreement defining the subscribers' obligations to the mortgagees were adopted by reference in the declaration of trust, not as covenants there made by the subscribers with the mortgagees, but as if the declaration of trust by appropriate language had for the first time specifically enumerated all of them as forming part of the terms and obligations under the trust which on the subscribers' part were to be performed;

(5) It was of no consequence in the circumstances that, with the exception of one, the subscribers did not affix their signatures to the trust instruments;

(6) Immediately upon the creation of the trust and its acceptance by the acts of the subscribers above described, a fiduciary relation resting wholly on the declaration of trust existed between the subscribers and the trustees, and the trustees were required to engage in the business of developing the real estate and were empowered to make contracts for this purpose in the name of the trust and under its provisions;

(7) The unpaid creditors might in equity have reached any trust property remaining for the payment of their debts;

(8) The trustees were entitled to maintain a suit in equity to compel the subscribers to pay so much of the unpaid portions of their subscriptions as would enable the trustees to satisfy the obligations of the trust to unpaid creditors for labor and materials supplied and for money borrowed for the benefit and use of the trust;

(9) As to the subscribers, a decree ordering such payment should be entered;

(10) As to the mortgagees, the bill should be dismissed.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on August 3, 1921, by the trustees known as Washington-Essex Building Trustees, constituted under a certain declaration of trust, against Reuben Broom-

field, Max Mitchell, Benjamin A. Prager, the executors of the will of Lassor Agoos, (all of whom are hereinafter referred to as the subscribers) and the corporations, The John Hancock Mutual Life Insurance Company and The President and Fellows of Harvard College (hereinafter referred to as the mortgagees) seeking to have determined what amounts were due to the plaintiffs as trustees from the subscribers, respectively, by reason of the provisions of an extension agreement, under and by reason of the provisions of which the declaration of trust was made.

The plaintiffs alleged in the bill that no relief was sought against the mortgagees, but that they were joined in the bill " so that they may be bound by such decree as is entered in this suit."

The master who heard the suit stated in his report that at the hearings " it was stated by certain counsel that ' the executors of Agoos were no longer in the case.' No one contradicted this statement. I assume that I am not expected to make any further report with respect to the plaintiffs' contention so far as their action is against the said executors or with respect to the latter's contention in this action."

The extension agreement, which was dated February 12, 1920, was under seal. The John Hancock Mutual Life Insurance Company and The President and Fellows of Harvard College as holders of mortgages were named therein as " the parties of the first part," and Mitchell, Prager, Agoos and Broomfield, " who are about to form a Real Estate Trust and become the owners of its shares which said Trust is to purchase the equity of redemption of the estate described in said mortgages," were designated as the "parties of the second part."

Material provisions of the extension agreement were in substance as follows: The mortgagees, who had commenced proceedings to foreclose the mortgages by reason of default in their conditions, agreed that they would not continue the foreclosure proceedings provided the subscribers would " pay or cause to be paid out of the cash capital of said Real Estate Trust " to the mortgagees accrued interest on the mortgages,

amounts advanced for insurance, taxes and operating expenses of the mortgaged premises, and taxes to become due, and would provide such amount as might be required for payment of a special assessment in connection with the widening of a street, " and if they and said Trustees shall duly fulfill and perform all the other conditions of said mortgages extended as aforesaid and the agreements herein agreed to be performed by them on or before March first, 1920."

.The subscribers also agreed to proceed forthwith to form the real estate trust under a declaration of trust dated February 12, 1920, and " to procure the conveyance to said Trust on or before March first, 1920, of the equity in said property . . . the funds for the purchase of said equity " and " to subscribe in cash as the capital of said Real Estate Trust, the sum of " $1,900,000.

The subscribers also agreed that " said Real Estate Trust to be formed as aforesaid shall proceed with all reasonable diligence to construct " a theatre on the premises at an estimated cost of $750,000, and that they would provide said real estate trust with all funds in excess of said $750,000 necessary for the completion of such theatre in addition to the cash capital of $1,900,000. The individuals who were to be the trustees of the real estate trust (who are the plaintiffs in this suit) were named in the extension agreement.

The subscribers also agreed that " said Real Estate Trust shall enter into an agreement without personal liability of the Trustees that said Trust to the extent of its capital assets shall keep and perform all the conditions of said mortgages " with certain modifications, and would cause a theatre corporation to be formed and to take a lease of the theatre.

Material provisions of the real estate trust are described in the opinion.

The suit was referred to a master. Material facts found by the master are described in the opinion. No exceptions to the report were filed by either party. The suit was heard by *Pierce*, J., who ordered that the master's report be confirmed and that a decree be entered against the defendants Prager and Mitchell in the sum of $624,450.97 and interest

thereon from March 1, 1921, and against the defendant Broomfield in the sum of $278,333.34 and interest thereon from March 1, 1921, and for costs against those defendants; and that such decree should be entered without prejudice to the rights, if any, of the defendant mortgagees to recovery in any other suits or proceedings for damages, if any, sustained by them from any breach by the other defendants of the extension agreement.

At the request of the parties and before the entry of the decree ordered, the single justice reported the suit to the full court for determination.

The case was argued at the bar in October, 1923, before *Braley, DeCourcy, Crosby,* & *Jenney,* JJ., and afterwards submitted on briefs to all the then Justices excepting *Rugg,* C.J., *Pierce,* & *Wait,* JJ.

*E. F. McClennen,* for the plaintiffs.

*B. B. Jones,* for the defendants Broomfield and Prager.

*G. L. Mayberry,* for the defendants John Hancock Mutual Life Insurance Company and The President and Fellows of Harvard College.

Braley, J. The John Hancock Mutual Life Insurance Company and the President and Fellows of Harvard College, against whom no relief is sought but who are joined as defendants " so that they may be bound by such decree as may be entered in this suit," held mortgages dated February 12, 1903, on the real property described in the record, which were given by the trustees of an association known as the Department Store Trust, the principal of which aggregated $3,500,000.

The master, to whose report no exceptions were taken and whose conclusions of fact on unreported evidence must stand, finds, that the individual defendants, hereafter referred to as the subscribers, with one Lassor Agoos, since deceased, desired to acquire ownership of the equity of redemption. *Armstrong* v. *Orler,* 220 Mass. 112, 113. The mortgages had been extended for ten years from the original date of maturity, and, foreclosure proceedings having been begun because of the " arrears of taxes, unpaid mortgage interest and other charges," the subscribers entered into an agree-

ment on February 12, 1920, with the mortgagees which as correctly summarized by the master contained the following material provisions: The subscribers on or before March 1, 1920, were to " cause to be paid out of the cash capital of the real estate trust which " they were to form, to be known by the name of " Washington-Essex Building Trustees," the unpaid interest, with interest thereon from the respective dates of maturity to the date of payment, with repayment of the amount advanced by the mortgagees on account of insurance, taxes and expenses incurred since October 10, 1919, with interest in accordance with an agreement made December 24, 1918, between the mortgagees and the Department Store Trustees. They also were to pay the expense of the foreclosure proceedings and the taxes assessed for the year 1918, with certain other municipal charges. The proposed real estate trust was to be organized February 12, 1920, to which on or before March 1, 1920, the subscribers were to procure a conveyance of the equity held by the Department Store Trustees pursuant to a vote adopted by the shareholders of that trust. And they expressly agreed " severally and not jointly " to provide funds for this purchase, apart from the amount which they also covenanted to subscribe and pay as the cash capital of the trust, $1,900,000, fifty per cent thereof to be paid on or before March 1, 1920, to the trustees, and the remaining fifty per cent was to be paid at such time or times as the trustees might require, but in any event the last payments were to be made within one year from March 1, 1920. The trust to be formed was to begin forthwith the construction of a theatre in the rear portion of the mortgaged property at an estimated cost of $750,000, and the trustees were at once to alter the exterior of the building not required for the theatre, but forming part of the addition, so that it could be leased for mercantile purposes. If an amount in excess of $750,000 was necessary to build, equip and complete the theatre free from liens of every description, and to make the outside changes, the subscribers undertook to provide the necessary funds in addition to the cash capital. The plans and specifications were to be furnished by the trustees and approved by the mortgagees before any altera-

tions were begun. A corporation was to be formed by the subscribers to which the theatre was to be leased for a term corresponding at least with the term of the proposed extension of the mortgages to which reference will subsequently be made. The lease was to be subject to the mortgages, and the annual rental was not to be less than $125,000, and the tenant was to give a bond in the penal sum of $200,000, satisfactory to the mortgagees, as security for payment of the rent and for the restoration of the building to its original condition if the rent was not paid. The mortgagees were to be given a lien or mortgage upon the furnishings and equipment of the theatre as additional security for the performance of the conditions of the mortgages as extended. The trustees were to make an agreement without personal liability, that the trust, but not in excess of its capital assets, should perform all the conditions of the extended mortgages " except as changed or modified by this Agreement," and should pay to the mortgagees on account of the purchase $50,000 on March 1, 1921, and a like amount on March 1 in each succeeding year up to and including 1930, and thereafter $60,000 up to and including 1940, and $70,000 thereafter, until the indebtedness was discharged. The mortgagees covenanted that, upon compliance by the subscribers with all of the precedent conditions, they would discontinue the foreclosure and extend the mortgages at the expiration of the extended period which had been first granted for a further term of twenty years, or until October 1, 1943.

We shall refer to this instrument of February 12, 1920, as the extension agreement. It contemplated for the development of the property an elaborate and thorough-going plan which upon completion with the proposed changes and enlargement would benefit the mortgagees by giving them additional security, and the subscribers by the enhancement in value of the equity of redemption. But the extension agreement could not become operative unless the Washington-Essex Building Trustees were duly organized by the subscribers and by the subscribers alone, and it is unnecessary to consider here what the rights of the mortgagees

would have been if nothing more had been done after the extension agreement had been executed.

The plaintiffs, who had been named therein as the proposed trustees, executed on February 12, 1920, after the extension agreement had been signed as the master reports, a declaration of trust under the name of the "Washington-Essex Building Trustees." The mortgagees indorsed thereon that, "The foregoing is the real estate trust organized pursuant to the requirements of the agreement of February 12th, 1920, between John Hancock Mutual Life Insurance Company and President and Fellows of Harvard College and Max Mitchell, Benjamin A. Prager, Lassor Agoos and Reuben Broomfield." But this indorsement did not make the mortgagees parties to the declaration of trust.

The master states that the trustees immediately began the performance of their duties, and he sets forth at length the proceedings of the plaintiffs in the execution of the trust. It is found that, apart from the amount subscribed as the cash capital, the subscribers procured the conveyance of the equity of redemption to the trust and formed the "Capitol Theatre Trust" which was accepted in place of a corporation, and on March 1, 1920, the plaintiffs leased the proposed theatre to that trust, and a bond to secure payment of the rent was given by the theatre trustees and approved by the mortgagees. The plaintiffs also on June 25, 1920, began the necessary alterations for commercial uses, and entered into agreements for labor and materials, although they did not bind themselves personally. The subscribers furthermore caused the trustees to employ architects and to undertake preliminary work in connection with the construction of the theatre.

The declaration of trust or trust agreement consisted of thirty-five articles. By articles twenty-nine and thirty the plan of organization and of operation are described as follows:

" Article XXIX. Plan of Organization — The Trustees shall at the instance of Max Mitchell and others who have executed a contract of this date with the mortgages aforesaid (a copy of which identified by the signatures of these Trustees is filed with the records of the Trustees), receive

conveyance directly or indirectly from the Trustees of the Department Store Trust created by Declaration of Trust recorded with the Suffolk Registry of Deeds at Book 2924, Page 274, covering the real estate and buildings now or heretofore held by them bounded by Washington Street, Hayward Place, Harrison Avenue and Essex Street, subject to the mortgages and encumbrances thereon, and in return for said conveyance and for the obligations undertaken by the said contractors Max Mitchell and others to the John Hancock Mutual Life Insurance Company and the President and Fellows of Harvard College, mortgagees as aforesaid, for the benefit of this Trust, by said contract, the Trustees shall assume the obligations contemplated to be performed by them in said contract and shall issue to the order of said Max Mitchell 25,000 cumulative preferred shares of a par value of $100 each, and 25,000 ordinary shares of no par value, both of said classes of shares to be issued as fully paid and non-assessable; and each of said preferred shares shall (subject to the obligations of said contract) be entitled out of any income as above described to 8 per cent (or such lesser rate as said contractor Max Mitchell shall before issue determine) per share annually, payable in equal parts semi-annually on February 1st and August 1st cumulatively, and to preference to the extent of their par value and any accrued and unpaid dividends over the ordinary shares in distribution of capital, and the holders of ordinary shares shall be entitled to receive all distributions of income and capital above that required for the preferred shares as aforesaid. Additional issues for cash or otherwise may be made and this plan may be modified in any manner, by vote of the Trustees without amendment of this Declaration of Trust.

" Article XXX.    Plan of Operation — A portion of said premises shall be altered into a theatre and leased for thirty (30) years to a separate corporation or trust in which the shareholders in this Trust may be interested and at a rental of One Hundred Twenty-five Thousand Dollars ($125,000) a year, the tenant to provide its own heat and inside repairs but to pay nothing toward interest, taxes or insurance on the building or theatre.    This plan may be modified in any

manner by vote of the Trustees without an amendment of this Declaration of Trust, but any modification shall be subject to the rights of the John Hancock Mutual Life Insurance Company and the President and Fellows of Harvard College under said contract of Max Mitchell and others with them of even date herewith."

The subscribers did subscribe for $1,900,000 as the cash capital of the trust. But out of $1,193,116.12, the total amount contributed in discharge of all their obligations, they paid directly to the city of Boston and to the mortgagees amounts aggregating $596,789.78, leaving a balance of $706,883.88 due on their subscriptions. The result as alleged in the bill and found by the master was that the alterations, although begun, never were completed, and the anticipated income was not realized. The creditors of the trust, who furnished labor and materials until further construction had to be suspended and never was resumed, remain unpaid because the plaintiffs have no funds to meet the indebtedness of the trust.

It is shown by the report, that the mortgagees in July, 1921, took possession of the premises for non-payment of interest due April 1, 1921, and foreclosed by sale September 29, 1921, when the property brought $3,500,000, the principal of the mortgages. While certain work had been done in beginning alterations for commercial purposes, the only new construction called for by the erection of the theatre was laying the foundations for the partition walls. A large part of the interior had been removed, but the reconstruction had " scarcely begun."

The mortgagees with the consent of all parties completed certain unfinished work so that two floors of the building could be utilized and leased. They contended before the master to be entitled to unpaid interest to September 29, 1921, with the expenses of foreclosure, the cost of work necessary to make the floors tenantable, the expenses incurred in the care of the building while the mortgagees were in possession before the foreclosure sale, and the amount paid architects representing the mortgagees which the subscribers agreed in the extension agreement to pay, a total

amount of $260,382.92, which the mortgagees conceded might be reduced if they were paid $91,264.12 under a bond given by a security company covering the second item of their claim. We do not decide whether the subscribers under the extension agreement are liable to the mortgagees for the whole or any part of this claim. It is plain that the trustees are not responsible, and in the absence of a cross bill the question whether the mortgagees can reach the assets of the trust in satisfaction of their demands or compel the co-defendants to pay cannot be determined in the present suit. *Forbes* v. *Thorpe,* 209 Mass. 570, 583. *Pickard* v. *Clancy,* 225 Mass. 89, 95.

The plaintiffs ask that the amount remaining unpaid on the subscriptions of the defendants Broomfield, Prager and Mitchell may be ascertained and ordered paid to them as trustees. The defendant Mitchell, although filing an answer and appearing once without counsel at the hearings before the master, did not appear at the argument and has not filed a brief. But Broomfield and Prager contend that, the subscribers having covenanted solely with the mortgagees in the extension agreement to which the trustees were not parties, the covenants entered into by them with the mortgagees cannot be enforced by the trustees and therefore the bill must be dismissed. The mortgagees however covenanted only to extend the mortgages for twenty years if the defendants performed their covenants. It needs no discussion to show that, if this position is well grounded, the creditors of the trust must go unpaid for labor and materials furnished under contracts with the trustees which were authorized by the subscribers. It may be conceded, as all the defendants contend, that only the parties to the extension agreement, which was under seal, can maintain an action at law or a suit in equity thereon for non-performance by the individual defendants who were parties of the second part. *Exchange Bank of St. Louis* v. *Rice,* 107 Mass. 37. *Borden* v. *Boardman,* 157 Mass. 410. *New England Structural Co.* v. *James Russell Boiler Works,* 231 Mass. 275. *In re Empress Engineering Co.* 16 Ch. D. 125, 129, 130. But the intention of the parties to the extension agreement as to what they in-

tended to accomplish and the mode or instrumentality by which it was to be effectuated is manifest. A trust was to be created under the title of the Washington-Essex Building Trustees, and the persons who were to act as trustees were named. The declaration of trust, to which the mortgagees were not to be parties, was to come into potential existence only through the positive and original action of the subscribers, who, when they became certificate holders, are expressly designated in articles three, four and eighteen, which provide for the distribution of principal and income, as the " *cestuis que trust,*" to whom certificates when they paid for shares were to be issued. The subscribers could, and did covenant with the mortgagees, that a trust should be created, but no provisions are found in the extension agreement prescribing the form of organization of the trust, or the powers of the trustees, or the reciprocal obligations to the trustees of the subscribers who became the beneficiaries under the trust.

The general powers of the trustees are shown by article eight:

" The Trustees shall have no power to bind the Trustees or any of them or the trust assets unless it be by instrument in writing signed in the manner hereinafter set forth or as from time to time determined by recorded vote of the Trustees and sealed with the seal of the Trustees and executed in accordance with a special or standing vote recorded on the books of the Trustees, and by documents so executed the Trustees shall have the power to take, receive, collect, acquire, buy, sell, borrow, lend, mortgage, pledge, encumber, lease, release, contract for or concerning, compromise concerning, or otherwise deal with or concerning any property of or for the trust, or in any way connected with its interests as the sole and absolute owners thereof at law and in equity and with as full powers as if such absolute owners at law and in equity and without leave or intervention of any court, and in whole or in parcels and at public auctions or at private sales, or otherwise, and to make partition with co-owners or joint owners outside the trust having any interest in any properties in which the Trustees are interested

and to make such partition either by sale or by set off or by agreement, or otherwise, and to make such leases even if the term thereof extend beyond the duration of the trust, and to make distributions in money or in property of the trust, and for such purposes to determine the value of such properties, and when anything is dependent upon the value of any property, and/or upon the existence of any fact to determine such value and/or such fact, and the certificate of such Trustees to such determination shall be conclusive in favor of anyone acting thereon in good faith, and the Trustees shall not be limited to investments which are lawful for Trustees."

The reference to the extension agreement in article twenty-nine is coupled and used with the words, " the Trustees shall assume the obligations contemplated to be performed by them in said contract . . . and shall issue " certificates to Mitchell of a certain number of cumulative preferred shares and of common shares of no par value, " fully paid and non-assessable," which do not appear in form or substance in the extension agreement, where no provision is found that the trust to be organized should issue certificates in which the subscribers as *cestuis* were to be shareholders, and who were to receive certificates of their respective holdings.

The provisions of the extension agreement defining the obligations of the subscribers to the mortgagees as previously stated are adopted by reference in the declaration of trust, not as covenants made by the subscribers with the mortgagees, but as if the declaration of trust by appropriate language had for the first time specifically enumerated all of them as forming part of the terms and obligations under the trust which on their part were to be performed. *Lipsky* v. *Heller*, 199 Mass. 310. *Abbott* v. *Frazier*, 240 Mass. 586, 593. The mortgagees did not bind themselves, or authorize the trustees to bind them, to pay any of the expenditures which must be made before an extension of the mortgages was to be given, and the instruments of extension, which were to be executed, sealed and acknowledged, were of necessity to be delivered not to the subscribers, but to the trust which held title to the equity of redemption. A covenant to create a

trust, and a trust created thereunder, are as widely different as a covenant to convey, and an executed conveyance. *Dennison* v. *Geohring,* 7 Penn. St. 175. If it became necessary, the beneficiaries could have brought suit in equity under article twenty-five for an accounting by the trustees of their administration, and for other adequate relief. *Newell* v. *Hadley,* 206 Mass. 235.

It is of no consequence that with the exception of Mitchell the beneficiaries did not affix their signatures to the declaration of trust. By the partial payment of their subscriptions, and the receipt of certificates as shown by the report, the subscribers acted under the trust, to which they had caused the equity to be conveyed, and they became as defined in article five and eight " *cestuis que trust,*" and the " trust beneficiaries." Directly and at once upon the creation of the trust and its acceptance in the manner and form shown by the record a fiduciary relation resting wholly on the declaration of trust existed between them and the trustees, who were to conduct the affairs of the trust free from the direction or control of the certificate holders. *Gerrish* v. *New Bedford Institution for Savings,* 128 Mass. 159, 161. *Welch* v. *Henshaw,* 170 Mass. 409. *Williams* v. *Milton,* 215 Mass. 1. *Frost* v. *Thompson,* 219 Mass. 360, 365. *Howe* v. *Chmielinski,* 237 Mass. 532. In the performance of their duties the trustees were required to engage in the business of reconstructing the building, for which detailed plans and specifications had been prepared, and they were empowered to make contracts for this purpose in the name of the trust under article eight, even if they were not to be personally bound.

The foreclosure of the mortgages not only extinguished the equity of redemption but terminated the trust in so far as further building operations of every description " were possible," and creditors, who the master reports never have been paid for labor and materials or for money lent, could on the record reach in equity any remaining trust property in payment of their debts. *Mason* v. *Pomeroy,* 151 Mass. 164, 167. *Woddrop* v. *Weed,* 154 Penn. St. 307. But, " It is a general principle that a trust estate must bear the expenses of its administration." *Trustees* v. *Greenough,* 105 U. S. 527.

And if the necessary funds can only be obtained by payment to the trustees but not to the mortgagees of the overdue obligations of the defendant subscribers which from the beginning formed part of the capital assets of the trust, the trustees can maintain the bill to compel payment respectively by the subscribers of so much of their unpaid subscriptions as will enable the trustees to satisfy the obligations of the trust to creditors who have furnished labor and supplied materials for the benefit of the trust, and for money borrowed by the trustees for the benefit and use of the trust. *Mason* v. *Pomeroy, supra. New* v. *Nicoll,* 73 N. Y. 127. *Williams* v. *Gibbes,* 17 How. 239. See *Tuttle* v. *First National Bank of Greenfield,* 187 Mass. 533, 535.

While the defendants are not chargeable with the estimated excess cost of the proposed theatre which never has been built, they are liable for the balance of the cash capital amounting to $706,883.88 in so far as that balance is necessary to enable the plaintiffs to liquidate the indebtedness of the trust incurred in carrying on building operations prior to foreclosure as well as for $200,000 borrowed by the trustees for its use.

The master after an exhaustive computation of the amount recoverable, to which neither the defendants nor the plaintiffs excepted and which need not be repeated, finds there was due the plaintiffs on March 1, 1921, from the defendant Broomfield $278,333.34, and from the defendants Mitchell and Prager jointly $349,460.97, to which interest computed at the rate of six per cent from March 1, 1921, to the date of entering the decree should be added. *DeCordova* v. *Weeks,* 246 Mass. 100. A decree against Broomfield, Mitchell and Prager, with costs, for the respective amounts is to be entered in the county court, where all necessary details are to be adjusted, but as to the defendant mortgagees the bill is to be dismissed.

*Ordered accordingly.*