THE FIRST NATIONAL BANK OF BOSTON *vs.* VALLIE G. SWIFT, administratrix, & others.

Suffolk.   November 17, 1926. — March 7, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & SANDERSON, JJ.

*Bills and Notes,* Joint note of syndicate, Collateral security. *Equity Pleading and Practice,* Parties, Plea in abatement, Report by trial judge of facts found, Cross claim. *Agency,* Existence of relation, Termination. *Evidence,* Competency. *Equity Jurisdiction,* To reach and apply equitable assets.

In a suit against the administrator of the estate of one member of a syndicate by the payee of a note for $160,000, signed by one as manager of the syndicate, for a balance of $11,400 remaining due thereon, it appeared that the syndicate was formed by an agreement in writing, and was organized for the purpose of purchasing for a certain sum the common stock of a corporation and of lending a certain sum to one of its officers, for which purposes $445,000 was to be borrowed; that the manager was given power "to borrow money for the account of the syndicate and to pay interest therefor, . . . to do any and all other things which in the exercise of the discretion of the manager he may consider advisable in order to carry out the foregoing plan for the purpose of this agreement and for the interest of the syndicate"; that the loan was to be secured by the agreement of each member of the syndicate to act as a guarantor up to an amount set opposite his name; that the agreement in terms bound the executors, administrators and assigns of each subscriber, and stipulated that the subscribers were not partners; that the note in suit was given by the manager, in renewal of a note originally given for the loan, two months after the death of the defendant's intestate, and in accordance with a written assent given by him before his death.   It was secured by collateral.   All the other subscribers had paid the amount they had guaranteed and the amount sought in the suit was that stated as guaranteed by the defendant's intestate.   *Held,* that
(1) While the syndicate was not a partnership, it was a voluntary association for the mutual benefit of the subscribers, of each of whom the manager was the delegated agent with the powers above described;
(2) The liability of the estate of the defendant's intestate was primary: it was intended that as toward the plaintiff the intestate should be a joint promisor;
(3) It appearing that no plea in abatement was filed, the question of nonjoinder of parties was not open and the suit might be maintained against the administrator as sole defendant;
(4) The plaintiff could bring suit without first exhausting the securities pledged by the syndicate;

(5) A contention by the defendant that the authority of the manager to bind the defendant's intestate ceased on the death of the intestate was without merit; the intestate in the syndicate agreement bound himself, his executors, administrators and assigns to the payment of his obligations arising under the management of the manager.

If a judge, who heard a suit in equity, files a statement of findings which includes all the material facts found by him as the basis for a decree, such statement satisfies the requirements of G. L. c. 214, § 23, and, even though requested, he may refuse to file a further statement.

The suit above described also was against a firm of stockbrokers, to reach and apply toward the payment of the plaintiff's claim the interest of the defendant's intestate in certain collateral securities. At the hearing, there was admitted in evidence a letter from the intestate to the defendant stockbrokers, directing them to close his account "by selling all securities held and send me balance cheque at your earliest convenience. It is understood that you will retain what is necessary to cover the . . . [syndicate matter]." *Held,* that the admission was proper, since the acceptance of the order, and the setting aside of the amount out of a larger sum in their possession, created a fund in the hands of the stockbrokers which could be reached and applied in payment of the plaintiff's claim.

A conversation between an assistant of the manager of the syndicate and an officer of the plaintiff, a banking corporation, also was *held* to be admissible in explanation of the circumstances in which the letter above described was sent and of the intestate's purpose in sending it.

The defendant administrator having filed no cross bill, it was not proper for the judge to include in the final decree in the suit above described provisions directing the delivery to the defendant administrator of the balance, remaining after satisfaction of the plaintiff's claim, of the proceeds from the sale of the interest of the intestate's estate in collateral securities in the possession of the defendant stockbrokers.

BILL IN EQUITY, filed in the Superior Court on January 2, 1925, against the administratrix of the estate of Francis H. Swift and the members of the partnership, Jackson and Curtis, stockbrokers, to reach and apply in satisfaction of a balance of $11,428.57, alleged to be due upon a note described in the opinion, the interest of the estate of Swift in certain collateral securities in the possession of the defendant stockbrokers.

In the Superior Court, the suit was heard by *Keating,* J., a stenographer having been appointed under G. L. c. 214, § 24, Equity Rule 35 (1905) to take the testimony.

Gloetzner, referred to in the opinion, the judge found, was an officer of the Covert Gear Company, Inc., and its manager, and had a large financial interest in the corporation;

as one witness expressed it, "he was the whole thing in the corporation." Other material facts are stated in the opinion.

The judge filed a "statement of findings and rulings" and on November 6, 1925, by his order a final decree was entered adjudging that there was due from the defendant administratrix to the plaintiff the sum of $12,592.42; directing the defendant stockbrokers to sell certain of the collateral securities described in the bill, and from the proceeds of such sale to pay to the plaintiff the amount due it from the defendant administratrix; directing the defendant stockbrokers from the balance of such proceeds to retain a certain amount as their costs, and (in a paragraph 4 of the decree) ordering that the balance of such proceeds be paid by the stockbrokers to the defendant administratrix; ordering (in a paragraph 5) the plaintiff to deliver to the syndicate manager certain securities held as collateral for the note in suit, and (in a paragraph 6) ordering the syndicate manager to deliver to the defendant administratrix certain other securities so held.

The defendant administratrix requested the trial judge "to report the material facts found by him." The judge in a statement in writing denied the request on the ground that "the statement of findings and rulings and the amendment thereto which were already filed have the effect of a report of the material facts found under G. L. c. 214, § 23." From such denial the defendant administratrix appealed.

The defendant stockbrokers appealed from paragraph 4 and paragraph 6 of the final decree, and the defendant administratrix appealed from the decree generally.

*J. W. Burke,* for the defendant Swift, administratrix.

*H. Williams, Jr.,* for the defendants Curtis and others.

*F. W. Eaton,* (*G. S. Fuller* with him,) for the plaintiff.

BRALEY, J. This is a suit for the establishment of a debt alleged to be due from the intestate according to the tenor of a promissory note, a copy of which is made part of the bill as amended, and to reach and apply in payment certain funds of the estate in the possession of the remaining defendants, a firm of stockbrokers with whom the intestate dealt.

G. L. c. 214, § 3, cl. 7.   We shall refer to the administratrix as the defendant.

The first question is, whether the intestate became bound as a maker on the note which is dated November 30, 1923, for $160,000, payable March 3, 1924.   It reads:   "We promise to pay," and it is signed "Covert Gear Syndicate By Robert C. Morse Manager."   The agreement in writing creating the syndicate is dated August 18, 1919.   It was signed by ten persons, one of whom was the intestate.   It is described in the record as "Plan and Syndicate Agreement Covert Gear Company, Inc." and it was organized for the purpose of purchasing three thousand five hundred four shares of the common stock of the gear company at a total price of $280,320, and to lend to one Gloetzner $200,000 upon receiving from him his note, or notes, for the aggregate amount of $200,000, to mature one year from date, with interest payable annually at the rate of six per centum, and secured by two thousand shares of the common stock.   It was planned on behalf of the syndicate to borrow of the plaintiff bank $445,000, of which $200,000 was to be lent to Gloetzner, while $245,000 was to be used in payment for three thousand five hundred four shares of Covert Gear common stock.   The balance of the purchase price, $35,320, was to be paid by the sale of stock and by payments from time to time by members of the syndicate, based upon the proportions called for under the respective subscriptions.   The loan was to be secured by a pledge of "said stock and note or notes . . . by 2,000 shares of stock given as original security therefor and the agreement of each member of the syndicate to act as a guarantor, up to the amount set opposite his name in column headed Guarantee of Gloetzner Note, of said note or notes."   The intestate's subscription was $15,000.   The life of the syndicate, unless terminated earlier by the manager, was limited to one year, while the liability of each subscriber as a guarantor was not to exceed his proportionate share, and in terms the agreement bound the executors, administrators and assigns of the subscriber.   It is stated in the agreement, that "The Subscribers hereby appoint Robert C. Morse as Manager," but he was to receive no

compensation for his services. If he died or resigned, a majority in interest of the subscribers could appoint a new manager. The manager, who was a member of the firm of Jackson and Curtis, who were subscribers, also was authorized to vote all the stock of the syndicate, and he incurred no liability except as a subscriber, or for failure to exercise good faith. It is further stipulated, that the subscribers are not partners; that they agreed to comply with all directions of the manager who was authorized to do all things necessary, or advisable, in his absolute discretion to carry out the purpose of the plan "under this agreement." He was specifically authorized " For and on account of the syndicate to employ counsel, agents, depositories, and necessary assistance, and to pay any and all expense in connection therewith . . . . To acquire and use any and all syndicate funds for the purpose of the syndicate, to purchase for and on behalf of the syndicate in his name or in the name of Jackson & Curtis 3,504 shares of the common stock of Covert Gear Company, Inc., at a total price of $280,320., to receive the same on account of the syndicate, to lend for and on behalf of the syndicate the sum of $200,000 to . . . Alwin A. Gloetzner and to receive in the name of Robert C. Morse, Manager, note or notes of said Gloetzner in the aggregate sum of $200,000, payable in one year from the date thereof, bearing interest at the rate of 6% per annum and secured by 2000 shares of the common stock of Covert Gear Company, Inc., to borrow money for the account of the syndicate and to pay interest therefor, to pledge, hypothecate and assign as collateral security any and all such stock, note or notes or other assets of the syndicate which may be in the possession or control of the Manager, to use the pro rata guaranties of the Subscribers, of said note or notes for the purpose of borrowing thereon, and to assign all or any part of the subscriptions of the Subscribers as collateral security to any person or corporation making advances to the syndicate or on account of the syndicate agreements. . . . To receive all dividends on said stock or interest on said loan and all other income of every kind and description from said stock and loan, and to apply the same to the payment

of the expenses and indebtedness of the syndicate and to the distribution among the Subscribers as hereinafter set forth. . . . To do any and all other things which in the exercise of the discretion of the Manager he may consider advisable in order to carry out the foregoing plan for the purpose of this agreement or for the interest of the syndicate."

The trial judge was warranted in finding that, in furtherance of the plan and in accordance with the agreement, Morse, on August 29, 1919, borrowed of the plaintiff bank on account of the syndicate $445,000 for the term of one year and pledged and assigned to the plaintiff as security for the loan certain of the assets of the syndicate in his possession, as well as the counterparts of the mutual agreement of the subscribers as to their liability as mutual guarantors. The manager had been clothed with authority, by the intestate and his associates, to hire money in the name of the syndicate and to pledge the syndicate's securities. It is evident that the whole project would have failed at the outset unless this course was taken. The syndicate was not a corporation nor a partnership as between themselves. It was a voluntary association for the mutual benefit of the subscribers of each of whom Morse was the delegated agent with the powers previously described. *Newell* v. *Borden,* 128 Mass. 31. *Magee* v. *Magee,* 233 Mass. 341. *Howe* v. *Chmielinski,* 237 Mass. 532. *Neville* v. *Gifford,* 242 Mass. 124. The liability of the intestate by the terms of the note was not secondary. It was a primary obligation incurred by his representative and agent, and, as between himself and the plaintiff, he was a joint promisor. *Long* v. *Colburn,* 11 Mass. 97. *Peoples National Bank* v. *Dixwell,* 217 Mass. 436. The action is brought against the defendant only, and, the promise of the intestate being joint, if she relied on the nonjoinder of his associates this fact should have been pleaded in abatement. But, the question not having been raised, the action can be maintained against her. *Ruggles* v. *Patten,* 8 Mass. 480.

The whole enterprise, however, proved to be a failure. The Covert Gear stock became worthless, and Gloetzner, whose entire fortune was involved, having become insolvent, his note also, on which he had paid $40,000, was of no value

and the members of the syndicate were obliged to suffer the loss, amounting to $160,000, for which they gave the note in issue.

It appears in the findings of the trial judge — which were warranted by the evidence and are a sufficient compliance with the defendant's request for findings under G. L. c. 214, § 23, *Berman* v. *Coakley*, 257 Mass. 159, — that at the date of maturity of the original note it was extended by renewal from time to time with the consent of all the members, and that the collateral also was changed with the written or oral consent of the intestate and the other members.   The result was that, on November 30, 1923, the outstanding indebtedness had been so reduced that the note for $160,000 represented the final indebtedness.   A statement, dated August 30, 1920, showing the amount due from each under the guaranties, was prepared and given to the members.   The intestate's share was $11,428.57.   The accuracy of this apportionment is supported by the record; it corresponds with the balance due on the note.

The plaintiff could bring suit without first exhausting the securities pledged by the syndicate.   *Wilson* v. *Martin-Wilson Automatic Fire Alarm Co.* 151 Mass. 515, 517. And, the other members of the syndicate having paid their respective obligations, the intestate was liable for the balance remaining of $11,428.57, with interest from March 3, 1924.   *Ruggles* v. *Patten, supra,* page 482.   The note in suit, dated November 30, 1923, and maturing March 3, 1924, is a renewal note for the balance remaining due on the original note, and, the intestate having died September 7, 1923, it is contended that his death revoked the agency of Morse. But on September 1, 1923, he wrote to Morse that he gave his consent to the extension of both the syndicate and the loan for a period of six months from September 5, 1923, and the other subscribers also consented thereto.   The intestate had bound himself, his executors, administrators and assigns to the payment of his obligations arising under the management of Morse, and, his authority not having determined when the renewal note was given, the defendant is chargeable

with the payment of the debt. *Cotton* v. *Atlas National Bank*, 145 Mass. 43.

The same result follows even if Morse, as the defendant contends, was a trustee under an investment trust. The subscribers, if denominated as beneficiaries or shareholders, authorized Morse in his discretion to manage the affairs of the trust, free from their direction or control, as specified in the agreement, and he could borrow money in the name of the syndicate for the payment of which they could be charged. *Dunbar* v. *Broomfield*, 247 Mass. 372.

The demurrer of the defendant was overruled rightly, and the trial judge correctly ruled that, on the evidence, the plaintiff was entitled to a decree.

The letter of the intestate, dated December 27, 1922, to the brokers directing them to close his account "by selling all securities held and send me balance cheque at your earliest convenience. It is understood that you will retain what is necessary to cover the Covert Gear matter," was admissible. The acceptance of the order, and the setting aside of the amount out of a larger sum in their possession, created a fund which could be reached and applied in payment of the plaintiff's claim against the consignor. *Buttrick Lumber Co.* v. *Collins*, 202 Mass. 413, 414, 415. *Security Bank of New York* v. *Callahan*, 220 Mass. 84.

The testimony of a conversation, which took place before the intestate's death, between Haynes, an assistant of Morse, and the plaintiff's vice-president, to the admission of which the defendant also excepted, was admissible in explanation of the circumstances under which the letter in December was sent, and the intestate's purpose in sending it.

But, no cross bill having been filed by the defendant, nor any counter claim, arising out of the transaction which is the subject matter of the suit and which might be the subject of an independent suit against her, having been stated in her answer, the question of a final accounting between her and the brokers is not before us. *Forbes* v. *Thorpe*, 209 Mass. 570.

The interlocutory decree overruling the demurrer, and the order denying the defendant's motion for a separate report

of the findings are affirmed. The final decree, however, must be modified by striking out the fourth paragraph, and, as so modified, it is affirmed with costs.

*Ordered accordingly.*